**Harold J. SULLIVAN, Petitioner,**

v.

**DEPARTMENT OF the NAVY, Respondent.**

**Appeal No. 83–748.**

United States Court of Appeals, Federal Circuit.

Nov. 8, 1983.

Harold J. Sullivan, pro se.

Marsha D. Peterson, Washington, D.C., argued for respondent. With her on the brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director and Sandra P. Spooner, Washington, D.C.

Susan D. Warshaw, Dept. of the Navy, Washington, D.C., of counsel.

Before FRIEDMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and NIES, Circuit Judge.

SKELTON, Senior Circuit Judge.

This is an appeal by Harold J. Sullivan (petitioner) from a decision of the Merit Systems Protection Board (MSPB or the Board), dated October 4, 1982, which affirmed a decision of the Board's Atlanta Regional Office approving a decision of the Naval Training Equipment Center (NTEC or the Agency) that removed the petitioner from the position of Education Specialist at the Agency on charges that he had submitted false claims against the government by claiming credit and being paid for time not actually worked at the times specified

on his time sheets on six specified dates. MSPB Docket No. AT07528010144. We reverse the decision of the Board and remand the case with instructions.

### The Facts

The petitioner is a veteran's preference eligible, having served as an officer on the United States Naval Sixth Fleet and later as a civilian employee, Grade 13, at the Agency. When terminated on July 5, 1980, he had 30 years of unblemished service in and for the Navy. He is an attorney and has five university degrees (B.S.E.E., B.A., B.S.M.E., M.S.Ed., and J.D.). He is licensed to practice law in state and federal courts, and has taught law courses in Florida at the college/university level. He argued his case before us *pro se*.

While working at the Agency, the petitioner filed a grievance on December 1, 1979, against Captain Donald H. Westbrock (Westbrock), the commanding officer of the Agency, in which he accused Westbrock of violating provisions of the Civil Service Reform Act of 1978 and other civil service rules and regulations. Following the filing of this grievance complaint, Westbrock, along with his naval subordinates, began a covert surveillance on petitioner. They monitored his attendance at the office, searched his desk and the incoming and outgoing trays thereon, checked his work, examined the discarded paper, etc., in his wastebasket and otherwise kept a watchful eye on his activities.

The record shows that on December 19, 1979, which was 18 days after the petitioner had filed the grievance against Westbrock, a neighbor of petitioner, Charles McClain, with whom petitioner had previously had some civil litigation, phoned an officer of the Naval Investigative Service (NIS) and informed him that petitioner was spending an inordinate amount of time at home for a government employee. This information was relayed to Westbrock, who stated that employees at the Agency were on flexitime, which allowed them considerable freedom as to working hours, and that he needed more detailed information. McClain prom-

ised to get it and did so. Having this additional information, Westbrock asked the NIS to take over the surveillance. At first the NIS refused, saying the information furnished to it was insufficient. In the meantime, Westbrock continued his personal surveillance of petitioner. He also tried to get the FBI to help in the surveillance, but the FBI declined to do so. Finally, Westbrock persuaded NIS to come into the case. The NIS assigned two men to work on the surveillance of petitioner. They worked for 21 days, which included six days on week-ends. Their surveillance consisted mainly of watching the parking lot where petitioner worked to see if his car (a green Volkswagen) was parked there, observing his home to see if and when his car was at home, watching two of the entrances to the building, and observing people who entered and left the building. They never at any time went to his office or phoned him there to see if he was working. They reasoned that if his green Volkswagen, which he frequently used, was not in the parking lot, or on the other hand was at his home, he was not in his office working. The facts showed that petitioner had five cars and four bicycles, and that he used all of them from time to time in going to and from the office.

Finally, when the agents of NIS had finished their surveillance, they obtained copies of the time sheets that petitioner had submitted and on which he had been paid and compared them with their surveillance logs. Discrepancies were found which were set forth in a NIS report furnished to Westbrock and which indicated that petitioner had not worked some of the times he had reported on his filed time sheets. On receiving the report, along with the NIS logs, Westbrock called a meeting of his department heads. During this meeting, Westbrock was heard to say "let's hang him" in referring to the petitioner. Whereupon, it was decided to bring charges against petitioner for filing false claims and defrauding the government. One Gary W. Morton, Director of the Engineering Department of the Agency, was present at the meeting and was selected by Westbrock to prepare the

charges against the petitioner, since Westbrock had recused himself from preparing the charges because of petitioner's grievance complaint against him. In acting on the charges and deciding the case, the deciding official had a number of options open to him, including complete exoneration and dismissal of the charges, reprimand, suspension, demotion in grade and reduction of salary, and removal from office. However, Morton prepared the charges so as to propose only one decision, which was the extreme penalty of removal from office. Thus it is clear that outright removal from office was the purpose and object of the charges and the only decision that would be satisfactory to management, and, of course, as commanding officer, management was Westbrock.

The charges were set forth in a document entitled, "Notice of Proposed Removal," which was served on petitioner on April 30, 1980. The notice stated, "It is proposed to remove you from employment at the Naval Training Equipment Center for submission of false claims against the Federal Government and wrongfully obtaining funds from the Federal Government by submission of false claims." Then followed a detailed list of the charges involving 21 days of surveillance by the NIS.

Notwithstanding the fact that Westbrock had recused himself from preparing and serving the charges, he was still actively participating in the case up to and including the day of the hearing on petitioner's oral and written response to the charges on May 27, 1980. This is shown by a written order signed by Westbrock on May 9, 1980, granting petitioner an extension of time to answer the charges, and by another written order signed by him on May 27, 1980, the day of the hearing, denying various motions presented by the petitioner.

Commander Joe R. Beene was appointed as the hearing officer to hear petitioner's response to the charges. The hearing was conducted on May 27, 1980, and petitioner appeared and presented his oral and written reply to the charges. The hearing was not adversary in nature and no evidence was submitted by the Agency, although Beene did ask petitioner various questions. The hearing was held solely to hear petitioner's reply to the charges. Several days later, Westbrock phoned Beene to urge him to hurry up with his report. During this conversation he said to Beene:

Hurry up, goddamn it, hurry up.

On June 5, 1980, Beene sent a four-page letter to Westbrock in which he discussed the evidence of both parties, and in which he recommended that the petitioner be removed from employment at the Agency. A copy of this letter was not sent to the petitioner, and he had no knowledge that it had been written until after he had been removed from his job by Admiral Shugart, the deciding official, as shown below.

When Westbrock received Beene's letter of recommendation, he sent the file in the case to Admiral Kenneth Shugart, who had been designated as the deciding official. Shugart had several aides on his staff, one of whom was Eben Hall. Shortly after the file had been sent to Shugart's office, Westbrock talked to Hall one or more times on the phone and urged him to see that Shugart's decision would be issued without delay. Also, Westbrock told Hall that in his opinion Beene's recommendation was correct and that the petitioner should be removed from office. Admiral Shugart testified that after he received the file and before he issued his decision, Westbrock sent him a recommendation that the petitioner be removed. On June 18, 1980, Hall and a Captain Salomon, aides to Shugart, sent Shugart a memo in which they recommended petitioner's removal. In the same memo, they stated that there was a strong possibility that Westbrock's motives in starting the investigation were somewhat less than pure and that he had ulterior motives. A Mr. McKenzie, another aide of Shugart, sent a memo to Shugart on June 20, 1980, in which he suggested various alternatives, including the removal of the petitioner on the basis of the NIS report of surveillance on six particular days instead of the entire 21 days. Shugart adopted this suggestion after spending less than one

hour on the case, and signed an order on June 24, 1980, removing the petitioner from employment at the Agency, effective July 5, 1980, based on the NIS evidence of surveillance on six designated days set forth in the order.

The petitioner appealed from Shugart's decision to the Board's Atlanta Field Office in Atlanta, Ga., where a trial was held on January 21, 1981. The presiding official of that office affirmed Shugart's decision removing petitioner from employment at the Agency. Thereafter, petitioner filed a petition for review with the Board in Washington. The Board denied the petition for review in an opinion and order dated October 4, 1982. The petitioner has appealed from that decision to this court. After carefully considering the pleadings, briefs and arguments of the petitioner, acting *pro se,* and of respondent's counsel, and the voluminous record of 1089 pages, we proceed to decide the issues raised on appeal as follows.

### Ex Parte Communications

The petitioner contends that the entire proceedings were tainted and rendered void by *ex parte* communications made by adversary Captain Westbrock to the deciding official, Admiral Shugart, and to Shugart's aide, Eben Hall, between the time of the hearing on petitioner's oral and written response to the charges before hearing officer Beene on May 27, 1980, and the date of Shugart's decision of June 24, 1980, removing petitioner from office. These *ex parte* communications have been referred to generally in the foregoing statement of facts. However, at the risk of being repetitive, we describe them in greater detail and set them forth more fully, along with the circumstances in which they were made, as follows.

After the hearing on petitioner's response to the charges on May 27, 1980, and after hearing officer Beene had written his letter of June 5, 1980, to Westbrock recommending petitioner's removal, a copy of which was not sent to petitioner, and before Shugart, the deciding officer, had issued his

decision on June 24, 1980, Westbrock sent the entire file to Shugart's office where it was received and examined by Shugart's aide Hall. Thereafter, Westbrock phoned Hall on more than one occasion urging Hall to hurry up Shugart's decision. Westbrock also drew a map of the building where petitioner worked, showing thereon where the NIS agents were stationed during their surveillance work and sent it to Hall. Finally, Westbrock told Hall on the phone that petitioner should be removed. This was admitted by Westbrock in his deposition as follows:

"Q. Did you have any discussions with Eb Hall on substantive matters after the May 27, 1980 oral response and before the letter came down June 24th from Admiral Shugart?

A. I indicated when I talked to Eb Hall, the only thing I can recall with Eb Hall is that I believe he asked me my feelings on the case and I indicated to him that we had, if I recall correctly, I indicated that we had researched to a great deal the civil service regulations and that the decision by Mr. Morton and the findings by Commander Beene in my opinion were consistent and honest, or not honest, but justified, proper.

Q. In other words, the removal of Sullivan?

A. Yeah, basically I had no problem with, I had no problem with that particular action.

Q. *That he be removed?*

A. *That he be removed.*" Westbrock deposition at 80 (Emphasis Supplied)

Also, during this time period, Westbrock admitted in his deposition that he phoned Shugart twice and urged him to hurry up his decision. Finally, Shugart said that Westbrock sent him a recommendation that the petitioner be removed. This is shown in the deposition of Shugart as follows:

"Q. Okay. And did he [Westbrock] tell you his feelings about this, that he thought the guy [Sullivan] ought to be removed or—

A. He didn't say anything about his feelings about that at that time.

Q. Okay, When did he tell you what his feelings were about this, sir?

A. Well, I don't recall him specifically stating his feelings, other than he sent a recommendation over here that he be removed." [1] Shugart deposition at 12

These *ex parte* communications were made covertly and secretly, and the petitioner did not know they were being made. It should be pointed out that Hall was Shugart's representative in handling petitioner's case. A communication to him was for all practical purposes a communication to Shugart himself. After Hall was told by Westbrock that petitioner should be removed, Hall (joined by Captain Salomon, another aide to Shugart) prepared and sent a memo to Shugart on June 18, 1980, recommending the removal of petitioner. Shugart issued his decision of removal four days later on June 24, 1980.

The Court of Claims, a predecessor court whose decisions are binding on us, held in an *in banc* decision in *Camero v. United States,* 375 F.2d 777 (1967) that *ex parte* communications by an adversary with those participating in a decision to remove a government employee from his employment invalidates the removal proceedings and entitles the employee to reinstatement with back pay. In this regard the court said:

> [P]laintiff contended that his dismissal was invalidated by certain alleged activities on the part of Theodore M. Kostos, the attorney who had represented the Agency before the Grievance Committee. These activities, according to plaintiff, involved *ex parte* communications between Kostos and those participating in the ultimate decision to sustain his removal, as well as actual participation by Kostos in that decision.
>
> Plaintiff's other assertion—that Kostos engaged in *ex parte* communications with those participating in the decision to sustain his removal—unlike the allegation of

actual participation in the decision, was amply supported by the evidence adduced at the trial proceedings, and it is for Kostos' activities in this regard that we hold plaintiff's removal to be invalid. 375 F.2d at 778–779

In that case, the court held further:
We have no doubt that Wolverton formed his own opinion on what recommendations he should make to General Anderson, just as we have no doubt that General Anderson made up his own mind when he decided to sustain plaintiff's removal. The problem is, however, that both decisions were made, at least in part, on the basis of the *ex parte* communication of the opinion of Kostos, who certainly, albeit perhaps not consciously, had as an adversary more than a neutral stake in the final outcome of plaintiff's case. This is enough to require us to invalidate plaintiff's removal as being in violation of the regulations governing the Army grievance proceedings.

\*　　\*　　\*　　\*　　\*　　\*

It is difficult to imagine a more serious incursion on fairness than to permit the representative of one of the parties to privately communicate his recommendations to the decision makers. To allow such activity would be to render the hearing virtually meaningless. We are of the opinion that due process forbids it. See *Vitarelli v. Seaton* [359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012], supra; *Service v. Dulles* [354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403], supra. 375 F.2d at 780–781

Finally, the court held:
Accordingly, plaintiff is entitled to recover back pay from the date of his wrongful removal to the date of judgment, less any salary he may have received during the period. from other employment. Judgment is entered to that effect. 375 F.2d at 781

---

1. The record does not show whether Shugart was referring to the file that Westbrock sent him which contained Beene's recommendation that petitioner be removed, or whether he was indicating that he had received an additional recommendation of removal from Westbrock. In either case, there is one thing we can be sure of, and that is that Shugart meant what he said when he testified that Westbrock "sent a recommendation over here that he be removed."

The Court of Claims had occasion to again consider the effect of *ex parte* communications on a decision to remove a government employee from his employment in the case of *Ryder v. United States,* 585 F.2d 482 (1978). In that case a Col. Peach, a government attorney, who was the superior of employee Ryder and was the prime instigator of the charges against him, wrote a memo to the deciding official, a Gen. Berry, recommending the decision Berry should make. The memo was an *ex parte* communication from Peach to Berry that was made without Ryder's knowledge. The court pointed out that Ryder had no opportunity to answer the memo. Gen. Berry's removal decision was in accordance with Peach's recommendation. The court invalidated the entire proceeding because of Peach's *ex parte* communication to the deciding official, citing and quoting from *Camero* as the leading case on *ex parte* communications by adversaries in personnel-removal cases. The court, in referring to the decision in *Camero,* said, among other things:

> The court held that this taint of *ex parte* communications from an adversary vitiated the entire removal proceeding; Camero was awarded back pay for the wrongful removal.[8]

[8] The *Camero* principle has continued to be accepted by this court. *See Bethlehem Steel Corp. v. United States,* 511 F.2d 529, 534, 206 Ct.Cl. 122, 131, *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975); *Jarett v. United States,* 451 F.2d 623, 629, 195 Ct.Cl. 320, 331 (1971); *J.L. Simmons Co. v. United States,* 412 F.2d 1360, 1385, 1387–88, 1389, 188 Ct.Cl. 684, 727–28, 731–33, 734 (1969); *Moore-McCormack Lines, .Inc. v. United States,* 413 F.2d 568, 584–85, 188 Ct.Cl. 644, 671–72 (1969). 585 F.2d at 486

The respondent in the instant case admits in Respondent's Memorandum In Response to Petitioner's Letter of July 11, 1983, that the *ex parte* communications described above were made. This admission states:

> We do not contend, and in fact have never contended, that the *ex parte* communications referenced by petitioner did not occur. Rather, we have admitted that they occurred.

Respondent then argues that they are not of the type found unlawful in *Camero* and *Ryder,* but are comparable to the *ex parte* communications involved in *Della Valle v. United States,* 231 Ct.Cl. —— (Order, 1982); *Grover v. United States,* 200 Ct.Cl. 337 (1973); *Salter v. United States,* 412 F.2d 874 (Ct.Cl.1969); and *Joyce v. United States,* 2 Cl.Ct. 226 (1983). We do not agree. We have carefully considered those cases and have concluded that they are clearly distinguishable from *Camero* and *Ryder* and from the instant case. In *Della Valle v. United States,* the plaintiff was removed from his position with the Navy for unsatisfactory work. He had complained of medical problems. A doctor found him to be fit and filed a report to that effect, a copy of which was not given to the plaintiff but was placed in his file. The hearing officer who received plaintiff's oral reply recommended removal. This recommendation was also placed in plaintiff's file, but a copy of it was not given to him. The court held that these were not impermissible *ex parte* communications of the *Camero* type, because they were not communications to the decision-maker from an adversary, but were merely internal documents of an advisory nature. That case is clearly distinguishable from our case where a true adversary with motives, of reprisal sought to pressure the deciding official into making a decision to remove the petitioner from his employment. In *Joyce v. United States,* the plaintiff was removed from his position as a VA Contact Representative. He complained of the *ex parte* submission of a memorandum to the hearing officer by another VA official. The Claims Court held that this was not improper. However, on appeal to the Civil Service Commission (now MSPB) (the Board), the Board relied on some of the *ex parte* evidence in the memo without giving the plaintiff an opportunity to introduce evidence regarding it. The court, on appeal, reversed and remanded the case because of this error. As can be seen, the *ex parte* communications in our case and those in *Joyce* are quite different. In our case a non-disinterested adversary sought to improperly influence the de-

ciding official. In *Joyce* the writer of the memo was not shown to be an adversary of the plaintiff. Furthermore, the memo was only furnished by him to the hearing officer. In the instant case, we are not concerned with *ex parte* communications with the hearing officer, but with those to the ultimate deciding officer, Admiral Shugart.

In *Grover v. United States,* the plaintiff was removed from his job with the IRS for, among other reasons, falsification of records. He complained of an *ex parte* statement given to the reply officer by plaintiff's supervisor, who did not get along well with plaintiff. The Court of Claims held that since the supervisor was not present at the hearing, it was proper for the reply officer to take his statement so that he could make a proper recommendation. Again, this is not the kind of improper *ex parte* communications we have in our case.

The case of *Salter v. United States,* like *Grover,* deals mainly with evidence considered by an agency in a removal case, and does not involve *ex parte* communications with the final decision official such as we have in the instant case.

Thus, we see that the cases cited and relied on by the respondent are inapposite to the instant case.

The respondent also argues that even if the *ex parte* communications were improper, the fact that they occurred was harmless error because petitioner had the opportunity to present the issue to the Board on appeal. The Court of Claims answered this identical argument in the *Ryder* case by pointing out that the error is committed when the *ex parte* statements are made to the first deciding official who could decide the case in favor of the employee. In this regard the court said:

> But Gen. Berry did have full and final authority to accept the examiner's report and to find for Mr. Ryder; he could on his own have ordered the removal set aside and plaintiff reinstated—and the whole proceeding would have ended there without any participation by FORSCOM. It is this power of Gen. Berry to end the case in Ryder's favor, without referral to

higher authority, which implicates the *Camero* principle of freedom from ex *parte* taints.

\* \* \* \* \* \*

An official who could authoritatively and finally restore the employee failed to do so after the exertion of improper *ex parte* influence.

It makes no difference that, at the next level when the case reached FORSCOM, Ryder had the opportunity to answer the views which had stemmed from Col. Peach (later transformed into Gen. Berry's own position). By then it was too late; plaintiff had irretrievably lost his valuable opportunity, explicitly given him by the regulations, to have Gen. Berry decide finally in his favor, untrammeled by improper *ex parte* approaches. 585 F.2d at 486–487

There can be no question that Admiral Shugart could have decided the case in favor of the petitioner, but did not do so. The only removal decision on appeal was that of Shugart. It was Shugart's decision that was affirmed by the presiding official of the Board's Atlanta Field Office, and it was Shugart's decision that was affirmed by the Board when it denied the petition for review. Therefore, the controlling decision was that of Shugart. The injury from the *ex parte* communications had already been done before the case reached the appellate stage, and this occurred without the knowledge of petitioner and without his having any opportunity to defend against it before the removal decision was made against him by Shugart. Obviously, it was too late for petitioner to do anything on appeal to prevent Shugart from making a decision he had already made.

Finally, respondent contends that Westbrock's *ex parte* communications made absolutely no difference in the case because of the evidence and the ultimate determination by the Navy. In other words, respondent argues that the petitioner would have been removed in any event because of the evidence against him. Again, this very ar-

gument was answered by the Court of Claims in the *Ryder* case.

In that case, the government argued that the decision should be against Ryder despite the procedural defect, because he would have been removed on the merits in the absence of the procedural defect in his firing. The court rejected this reasoning, saying:

> However, where a serious procedural curtailment mars an adverse personnel action which deprives the employee of pay, the court has regularly taken the position that the defect divests the removal (or demotion) of legality, leaving the employee on the rolls of the employing agency and entitled to his pay until proper procedural steps are taken toward removing or disciplining him. *In that situation, the merits of the adverse action are wholly disregarded.* (citations omitted)
>
> The perfect illustration is *Camero* in which the court first held squarely against the employee on the merits of his separation, 345 F.2d 798, 170 Ct.Cl. 490 (1965), and later ruled that he could nevertheless recover back pay because of the same type of procedural defect we see in the present case. 375 F.2d 777, 179 Ct.Cl. 520 (1967). 585 F.2d at 487–488 (Emphasis Supplied)

 We hold that Westbrock's improper *ex parte* communications were not only unfair, but also denied petitioner his rights under the due process clause of the Constitution. We hold further that they tainted the investigation, voided the entire proceeding, and rendered Admiral Shugart's removal decision a nullity. The decision of the Board to the contrary is erroneous as a matter of law.[2]

### Prohibited Personnel Practice

Petitioner alleges that his removal by the Agency was a prohibited personnel practice and a violation of 5 U.S.C. § 2302(b)(4), (b)(8)(A), (b)(9), and (b)(10), which provides in pertinent part as follows:

(a)(1) . . . "prohibited personnel practice" means any action described in subsection (b) of this section.

(2) For the purpose of this section—

(A) "personnel action" means—

(i) an appointment;

(ii) a promotion;

(iii) an action under chapter 75 of this title or other disciplinary or corrective action;

\* \* \* \* \* \*

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—

\* \* \* \* \* \*

---

**2.** The concurring opinion mistakenly states that the *ex parte* communication argument is an entirely new issue interjected into the case by the majority which was not raised before the Board nor decided by it, and that it cannot be raised nor decided for the first time on appeal. The record is to the contrary and shows the error of these statements. For instance, the Board's Atlanta Field Office presiding official, who held the only adversary hearing in the case, stated in his decision that Sullivan was complaining of Westbrock's *ex parte* communications, and then proceeded to discuss them in more or less detail. Thereafter, he decided the issue against Sullivan. See Part III, Pages 987–988 of the Official Administrative Record of the MSPB (A.R. at 987–988) in this case.

The record shows further that Sullivan raised the issue before the Board in his written Petition For Review. A.R. at 1019. The government answered Sullivan's Petition For Review in this regard in writing in its response to Sullivan's petition. A.R. at 1064. The Final Opinion and Order of the Board commented on Sullivan's complaint regarding the communications between Westbrock and the deciding official and then decided the issue against him. A.R. at 1080. The record shows that the issue was raised by Sullivan at every adversary stage of the proceeding and that the Board decided it against him.

In any event, the issue is one of due process that was briefed (Sullivan's brief at 15–18) and orally argued by both parties in the instant proceeding. It is properly before the court and we are authorized to decide it to prevent injustice that would otherwise result. *Hormel v. Helvering,* 312 U.S. 552, 556–557, 61 S.Ct. 719, 725, 85 L.Ed. 1037 (1941); *Singleton v. Wulff,* 428 U.S. 106, 120–121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Carson Products Co. v. Califano,* 594 F.2d 453 (5th Cir.1979).

(4) deceive or willfully obstruct any person with respect to such person's right to compete for employment;

\* \* \* \* \* \*

(8) take or fail to take a personnel action with respect to any employee ... as a reprisal for—

(A) a disclosure of information by an employee ... which the employee ... reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) mismanagement ... if such disclosure is not specifically prohibited by law ...

(9) take or fail to take any personnel action against any employee ... as a reprisal for the exercise of an appeal right granted by law, rule, or regulation;

(10) discriminate for or against any employee ... on the basis of conduct which does not adversely affect the performance of the employee ... or the performance of others .....

We will confine our discussion of this issue to a consideration of subsection (b)(8), which appears to be applicable to the instant case. Under this subsection, the petitioner had the burden of showing that (1) a protected disclosure was made, (2) the accused official (Westbrock) knew of the disclosure, (3) retaliation resulted, and (4) there was a genuine nexus between the retaliation and the petitioner's removal. *See In Re Frazier,* 1 MSPB 196 (December 17, 1979), *aff'd* 672 F.2d 150 (D.C.Cir.1982). The respondent admits in its brief that the first two requirements were met by the petitioner. Therefore, we will discuss only the last two. Reduced to its simplest terms, requirement (3) involves the question of whether or not Westbrock took a personnel action against the petitioner as a reprisal for the petitioner's filing of a grievance against Westbrock. We have already shown above that after petitioner filed his grievance complaint, Westbrock said to his department heads, "let's hang him" when referring to the petitioner; that he appointed one of those present, Gary Morton, to prepare the charges; that Westbrock initia-

ted the investigation and personally participated in the surveillance of petitioner, his office, his desk and wastebasket, and his car; that he ruled on motions of petitioner up to and including the day of the hearing on petitioner's response to the charges even though a hearing officer (Beene) had been appointed; that he continually pressured Beene, Hall and Shugart to hurry up their decisions; that he engaged in *ex parte* communications with Hall and Shugart; and, (a fact not heretofore mentioned), that after Shugart made his removal decision based on six of the twenty-one surveillance days, Westbrock phoned Shugart and criticised him for not basing his decision on all of the twenty-one days of the surveillance. All of these actions of Westbrock show unmistakably that he was acting with a grudge against petitioner, and that his outward recusal of himself from the case was a meaningless sham. The only question left to be determined is his motive for doing the things he did. The record shows that the memo from Hall and Salomon to Shugart recommending petitioner's removal stated:

4. There thus remains the question of what appropriate action, if any, should be taken against Dr. Sullivan. In deciding this issue, *one must at least consider the very strong possibility that Captain Westbrock's motives in starting this lengthy and detailed investigation were somewhat less than pure* in light of the detailed grievance concerning the command's merit promotion policy filed by Dr. Sullivan in December 1979. The real question is, however, whether Captain Westbrock's *ulterior motives (and we think the same existed)* have any bearing on what should happen to Dr. Sullivan. (Emphasis supplied)

The presiding official of the Board's Atlanta Field Office quoted the above paragraph from Hall and Salomon and made the following comment regarding it in his opinion:

Furthermore, the deciding official's representative, [Hall] who reviewed the disciplinary file and assisted him in preparing a summary of the facts of the case, reported that he considered the possibility

of improper motivation, but found sufficient independent evidence of the appellant's misconduct to support the removal action.

Thus, the presiding official seemed to assume that Westbrock acted with improper motives, but decided the case on other grounds.

The Board stated in its opinion denying petitioner's petition for review:

The Board finds—that reprisal for this grievance substantially motivated the beginning of the lengthy and detailed investigation—

■ We conclude from the facts in the case, when considered as a whole, plus the findings of the officers who participated in the case, including the Board, that Westbrock's actions throughout the case were motivated by reprisal and that he took the action against petitioner as a reprisal for filing the grievance against him. We conclude further that in view of Westbrock's reprisal motivation and his dominant role in the case throughout the proceedings, reprisal resulted from the action of the Agency, and that there was a genuine nexus between the retaliation and petitioner's removal, thus meeting the requirements of (3) and (4) set forth above.

We hold that petitioner's removal by the Agency was a prohibited personnel action that violated 5 U.S.C. § 2302(b)(8), and that the decision of the Board to the contrary was erroneous as a matter of law.

### Conclusion

■ We hold that the decision of the Board is arbitrary, an abuse of discretion, and erroneous as a matter of law. The decision of the Board is reversed and the case is remanded to the Board with instructions to order the petitioner reinstated to his former position with the Agency, with back pay from the date of his wrongful removal to the date of final judgment, less earnings from other employment during the removal period, plus all benefits and entitlements he would have received had the adverse action not been brought against him.[3]

REVERSED AND REMANDED.

NIES, Circuit Judge, concurring.

In my view, the decision of the MSPB should be set aside because of an error of law with respect to its interpretation of the requirements of a defense of reprisal. However, I do not join in reversal based on *ex parte* contacts. I also find it necessary to present a somewhat different view of the facts.

#### I

#### *The Merits*

Sullivan was required to work at the Naval facility in order to be entitled to overtime pay or compensatory time. There is no question in this case but that Sullivan submitted inaccurate time sheets. He admits that the specific times he reported on his time sheets for his work at the facility on weekends were not correct. His defense is that he worked the *number* of hours for which he received either pay or compensatory time and was merely careless about the specific times he put down on his reports.

---

**3.** The concurring opinion questions our authority to issue instructions to the Board to issue an order requiring reinstatement and payment of back pay and other benefits, and says that only the Claims Court can issue such instructions. The opinion also assumes that we are proceeding under the Tucker Act, 28 U.S.C. § 1491, in issuing instructions to the Board. The opinion is in error as to both points. In the first place, while the Claims Court can issue such instructions in other types of cases, it has no authority whatever to do so in an appeal from a decision of the MSPB, because the Federal Courts Improvement Act of 1982 vests exclusive jurisdiction of such appeals in this court. 28 U.S.C. § 1295(a)(9). In the next place, we are not proceeding under the Tucker Act in issuing such instructions, but are doing so under 5 U.S.C. § 7703(c). We have the same authority in this regard that the Court of Claims had under 7703(c). Senior Judge Cowen, joined by Judges Friedman and Kashiwa, held in *Brewer v. U.S. Postal Service,* 647 F.2d 1093, 1098–9 (Ct.Cl.1981) that the Court of Claims could on remand under 5 U.S.C. § 7703(c) of the Civil Service Reform Act of 1978 instruct the Board to order reinstatement and payment of back pay and related benefits to a discharged employee. We have the same authority under 7703(c) and 28 U.S.C. § 1295(a)(9).

The majority opinion would indicate that the surveillance was a farce. It was not. A review of Sullivan's time sheets submitted by Sullivan before the surveillance showed he had never reported any overtime prior to 0800. Therefore, the surveillance began shortly before 0800. There was ample parking space next to the only entrance open for weekend entry. That area and door, as well as his home, were monitored. The fact that the agents never checked his office or telephoned him in his office was for the reason that the surveillance was covert.

The Presiding Official found that Sullivan's explanation of his activities was incredible. As an example of one of the days for which he claimed pay, Saturday, March 15, 1980, his time sheet represents that he arrived at work at 0845 departed at 1245 returned at 1415 and departed at 1615. The surveillance disclosed that he arrived at 1008 and departed at 1358. His explanation is that he reported at 0700 by bicycle, departed at approximately 0930, returned at approximately 1010 in green car, departed 1245, returned 1415 in white car, and departed 1615 for the day. For over seven hours of work, he says he charged for only six. Similarly, on Sunday, March 9, 1980, he reported officially that he worked from 0810 to 1240, and 1330 to 1530. The surveillance disclosed that he arrived at 0910, departed 1220, and made no other entries into the building. His explanation is that he reported at 0700 by bicycle, departed 0830, reported approximately 0900 in green car, departed 1240, reported 1330 on a red motorbike, and departed 1530, thus working 7 hours and 10 minutes, for which he charged the Government 6 hours and 30 minutes. Similar comings and goings in various ways characterize each of the six days.

The Presiding Official carefully considered all of the evidence, including the fact that at times the surveillance officers checked his home, and he reached the following conclusion:

> I have also carefully weighed the defendant's manner and demeanor while testifying at the hearing and considered his admissions that he knowingly made entries on the time and attendance report which falsely depicted him to be at work when, in fact, he was not there, and that he knew that inaccurately reporting the times at work was in direct violation of the agency's regulation. I have also observed the manner and demeanor of the NIS agents during grueling cross-examination. I find their testimony much more credible than the defendant's statements and testimony.

The Presiding Officer also found it inconceivable that appellant's "arrivals and departures would so neatly coincide with the agent's absences from the surveillance site or otherwise go unnoticed." Since these findings have not been set aside, the removal action must be sustained against Sullivan unless he has an affirmative defense.

## II

### Reprisal Defense

The only basis for dismissal of Sullivan's affirmative defense of reprisal was stated to be:

> The Board finds that though the appellant had filed a grievance against the official who started the investigation into appellant's claims of time worked, and that reprisal for this grievance substantially motivated the beginning of the lengthy and detailed investigation, ordering such an investigation is not taking a personnel action. 5 U.S.C. § 2302(a)(2). Furthermore, this official did not take the personnel action, removal against appellant. Appellant proved no causal connection between the taking of the personnel action and the tainted motivation which precipitated the investigation. Appellant failed to prove that retaliation was a significant factor in the agency's decision to remove him.

As I understand what the board is holding, reprisal cannot be established if the case against an employee is a good one and the person instigating removal proceedings does not actually take the removal action himself.

I find this is error, as a matter of law, on both points. 5 U.S.C. § 7701(c)(2)(B) provides that an adverse action may not be sustained if the employee shows that the decision was based on any prohibited personnel practice described in § 2302(b). In an adverse action proceeding, the affirmative defense of reprisal is significant only in those cases which have been determined to have merit. Thus, the merits cannot be the determinative factor that there was no reprisal. A meritorious adverse action must be set aside where there is reprisal.

The second factor, that is, that Westbrock did not take a personnel action, is invalid, in my view, under 5 U.S.C. § 2302(b) as a matter of statutory construction. The section reads, in pertinent part:

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—

\* \* \* \* \* \*

(8) take or fail to take a personnel action with respect to any employee . . . .

Westbrock is within the category of persons defined in § 2302(b) and he not only started the investigation leading to the personnel action against Sullivan (which establishes "nexus") but also "recommended" a personnel action against Sullivan. No more is necessary. I read the phrase "take or fail to take" in subparagraph (b)(8) to encompass any of the authority specified in the lead-in paragraph. In other words, a *recommendation* to take an action is on a par with *taking* the action. Moreover, I agree with Sullivan's position that

WESTBROCK's continuous, behind-the-scenes, manipulations and orchestration of the removal decision established that his agreed-upon recusal was a meaningless sham and illustrative of the Agency's bad faith reprisal action and motives in this case.

---

* While the majority uses the term "hearing" to identify the oral response made to the agency, it is not used in a "due process" sense. As

## III

### Ex parte Communication

With respect to this issue, I do not join the majority. I believe it is greatly to be preferred to rely solely on the statute. I find the judge-made protection against *ex parte* contacts prior to the hearing stage \* to be the type of doctrine which leads to confusion and essentially to *ad hoc* decisions.

Sullivan's argument to the MSPB on *ex parte* contacts was solely directed to violation of the statutory provisions and regulations which require that an employee must be given notice of the reasons and access to materials which are relied on to support the action against him. 5 CFR § 752.404(b); 5 CFR § 752.203(b); and 5 U.S.C. § 7513(b) and (e). He argued that he did not receive all materials relied upon by the agency. He further argued that *no ex parte* communications are allowable in the decision-making process, after he made his oral reply, since he was not given an opportunity to refute information received *ex parte*. He treated the *ex parte* contacts with the FBI and all NAVTRAEQUIPCEN employees on a par. Contacts with Westbrock were not singled out except in connection with the assertion of reprisal. The MSPB ruled:

In this case, the presiding official found that the agency had furnished appellant with all material in support of its stated charges and that he had even been afforded an additional opportunity to respond before the agency deciding official issued the decision. Appellant's bare assertion of error is insufficient to trigger a complete review of the presiding official's findings. *Lopez v. Veterans Administration,* MSPB Docket No. DA07528110066 (June 16, 1962); *Weaver v. Department of the Navy,* 2 MSPB 297 (1980). Further, based on the foregoing discussion, it is clear that the presiding official did not err in his interpretation of 5 C.F.R. § 752.404, and that the agency fully satisfied its obligation to notify appellant of

indicated by the majority, the "hearing" was "not adversary in nature."

and provide him a reasonable opportunity to review the material in support of the advance notice of charges.

The position of the MSPB is entirely in accord with the decision of this court in *Depte v. United States,* 715 F.2d 1481 (Fed. Cir.1983). As stated by Judge Davis therein:

> Of course, petitioner was not constitutionally entitled, at the agency stage, to confront the witnesses against her, but merely to those procedures mandated by statute or regulation. *Arnett v. Kennedy,* 416 U.S. 134 [94 S.Ct. 1633, 40 L.Ed.2d 15] (1974); *Giles v. United States,* 553 F.2d 647, 649 (Ct.Cl.1977). Here, no statute (including the Civil Service Reform Act) and no regulation required an evidentiary hearing at the agency level or prohibited (at that stage) *ex parte* communications with witnesses to an incident of this type. It is settled that the right to make a written and oral reply (which petitioner received) did not call for such a hearing nor did it preclude the *ex parte* discussion undertaken by the agency. *Grover v. United States,* 200 Ct.Cl. 337, 349–51 (1973), expressly so held. Mrs. Depte later had a full evidentiary hearing (at which Sterner and the agency's deciding official both testified and were subject to cross-examination) before the presiding official of the MSPB.[6] That was adequate under the Constitution, the statute, and the regulations applicable to this case. The prior proceedings at the agency stage were not unlawful. [Footnote omitted.]

The board made no ruling on the issue of proper versus improper *ex parte* contacts. Moreover, in this appeal, Sullivan continued to make the argument that *ex parte* contacts *per se* are improper. To quote from his brief:

> WESTBROCK's ex-parte communications with his fellow officer (CNET) was not merely an evaluation of record evidence as such ex-parte communications were of the type ... that went to the essence of the validity of the Agency's decision in this case and, therefore, Petitioner should

have been afforded an opportunity to review, comment upon, and counter such ex-parte communications. In *Doe v. Hampton* [566 F.2d 265] that Court, on Page 278 stated:

> .... We, of course, do not intend to hamper the Commission with the fear that the validity of its decisions will be jeopardized whenever it attempts better to inform its deliberative process and to assure a correct result. When, however, for whatever reason, it seeks to obtain further evidence against which to adjudge the validity of the agency's adverse personnel decision, both the Commission's own regulations and fairness to the individual employee require that evidence be placed in the record for all the parties to see and, should they choose, make their views known.

The majority decision that improper *ex parte* contacts tainted the proceeding is not merely a new argument developed by the majority to overrule a holding by the MSPB on an issue below. Rather, it is an *entirely new issue* interjected into the case. It is well settled that this court does not act *de novo* in MSPB appeals but can only *review* the decision of the board. There is no reviewable decision on this issue. Regardless of merit, new non-jurisdictional issues cannot be raised and decided for the first time on appeal. Finally, since reprisal was found by the majority, this basis for its decision is wholly unnecessary.

### IV

#### *Remedy*

The authority granted to this court under 5 U.S.C. § 7703(c) is to "set aside" agency action. I do not find any authority to order reinstatement or payment of back pay. That may flow from setting aside the action of the agency and, if not, Sullivan may have a claim against the Government, offset, *inter alia,* by payments on his false claims for overtime.

The statute relating to appeals to this court from MSPB decisions is significantly different from the former statute authoriz-

ing appeals to the United States Court of Claims. Under the former statute, 5 U.S.C. § 7703(c) specifically directed that petitions were filed as provided in Chapter 91 of Title 28, *i.e.*, 28 U.S.C. § 1491. Under that statute the Court of Claims was empowered to "render judgment upon any claim against the United States" and to "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States." That authority now resides in the United States Claims Court, not this court. Unlike the United States Court of Claims, which had both trial and appellate functions and powers, this court is strictly an appellate court. It may no longer look to 28 U.S.C. § 1491 as a basis for its authority and may not treat an MSPB appeal the same as a back pay case, which the United States Court of Claims was free to do. *Cf. Meyer v. Dept. of Health & Human Services,* 666 F.2d 540, 541 (Ct.Cl.1981), ("This *civilian pay* case is before the court on petitioner's *appeal for review* of an order of the Merit Systems Protection Board (MSPB)," (emphasis added)).

The majority relies on *Brewer v. United States Postal Service,* 647 F.2d 1093 (Ct.Cl. 1981), which, in fact, supports my view. As stated therein at 1098:

Since this is the first review by this court of a decision of the Merit Systems Board under the Civil Service Reform Act of 1978, we call attention to the fact that the petitioner seeks relief which is not within our power to grant under the Act. He sues for back pay, requests reinstatement, and claims the right to related benefits. The standard of review set forth in the Act is limited. We are authorized only to "hold unlawful and set aside" an improper agency action. 5 U.S.C. § 7703(c). Therefore, we are without jurisdiction to render a money judgment—a Tucker Act remedy which the court is empowered to grant in other cases.

Apparently the court had the same doubt as I, with respect to what action it could take had the result been the other way, and opined:

If judgment had been rendered for petitioner, we would have been required to remand the case to the Merit Systems Protection Board with instructions to determine the amount of back pay and related benefits due and to reinstate him.[5]

[5] In response to a question at oral argument, respondent's counsel expressed the view that when the court decides that the agency action should be set aside as unlawful, it has the power to remand with instructions to award the discharged employee back pay and to reinstate him to his former position.

(647 F.2d at 1099.)

No controlling precedent can arise from dictum on a question not before the court. Nor can the jurisdiction of the court be established, in any event, simply by the answer of Government counsel.