# United States Court of Appeals for the Federal Circuit

---

**MATTHEW R. SILER,**
*Petitioner*

**v.**

**ENVIRONMENTAL PROTECTION AGENCY,**
*Respondent*

---

2017-2446

---

Petition for review of the Merit Systems Protection Board in No. CH-0752-16-0564-I-3.

---

Decided: November 13, 2018

---

MOLLY E. BUIE, Seldon Bofinger & Associates, P.C., Washington, DC, argued for petitioner. Also represented by ROBERT C. SELDON.

MEEN GEU OH, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by ELIZABETH M. HOSFORD, ROBERT E. KIRSCHMAN, JR., JOSEPH H. HUNT; PAUL M. SCHNEIDER, Office of General Counsel, United States Environmental Protection Agency, Washington, DC.

---

Before O'MALLEY, CLEVENGER, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

The Environmental Protection Agency removed Mr. Matthew Siler from his position following an administrative investigation. On appeal to the Merit Systems Protection Board, the Board sustained the agency's attorney-client privilege claim as to certain draft documents related to Mr. Siler's removal, found in favor of the EPA on Mr. Siler's whistleblower defense, and ultimately affirmed the EPA's decision to remove Mr. Siler.

Mr. Siler argues that the Board erred by finding the draft documents privileged and that it misapplied the law concerning his whistleblower defense. Because we agree, we vacate the Board's decision and remand this case.

BACKGROUND

*Mr. Siler's Original AK, Inc.*

From 1997 to 2016, Mr. Siler served as an EPA Special Agent in the agency's criminal investigation division (CID), a subdivision of its Office of Criminal Enforcement, Forensics, and Training (OCEFT). As a special agent, Mr. Siler investigated criminal violations of environmental law.

While at the EPA, Mr. Siler also operated a personal business, Original AK, Inc., through which he sold military collectibles and firearms. J.A. 1490–91. Though EPA regulations require employees to disclose all outside businesses, Mr. Siler admits that he failed to report his involvement with Original AK. *See* J.A. 622–35 ("Absolutely I filled out the form wrong . . . ."). Mr. Siler also admits that he used his government computer for this personal business, violating EPA rules. *See* J.A. 350, 635–48 ("I should not have used my . . . government computer for these transactions.").

A 2014 incident brought Original AK and these rule violations to the EPA's attention. As part of his Original AK business, Mr. Siler had obtained AK-47 part kits and contracted for the kits to be assembled into operational rifles. J.A. 399–400, 656–62. After becoming dissatisfied with his contractor's work, Mr. Siler decided to recover the part kits. He drove to the contractor's workshop, retook the parts, and loaded them into a rented van. J.A. 400–02, 675–81. Mr. Siler then drove towards home. J.A. 1877–80. Tired from his trip, he parked his van, still loaded with the rifle parts, in EPA parking rather than his personal storage facility. *Id.*

Shortly after he retrieved the part kits, Mr. Siler received an email from the contractor itemizing costs. J.A. 226–27. Mr. Siler responded, demanding the return of almost all of his deposit and stating "there are severe criminal and civil penalties for your actions . . . . I am fully prepared to turn my evidence of these firearms offenses over to the proper authorities . . . should you elect not to return my money." J.A. 412–14. Mr. Siler later admitted that he had tried to intimidate the contractor and had intentionally used "scary" language. J.A. 687–89, 1947. He affirmed that, though the contractor had violated gun laws, Mr. Siler did not intend to report those violations if the contractor returned his money. *See* J.A. 687–88.

On receipt of Mr. Siler's email, in May 2014, the contractor promptly filed a complaint with the Bureau of Alcohol, Tobacco, Firearms and Explosives. J.A. 419. The EPA placed Mr. Siler on administrative leave while the Office of the Inspector General (OIG) investigated. OIG cleared Mr. Siler of criminal charges in January 2015. *See* J.A. 393–98. It then transmitted its report to OCEFT Director Henry Barnet for "administrative review and any action deemed appropriate," and Mr. Siler returned to work on light duty. J.A. 396.

In June 2015, Mr. Siler was still on light duty. J.A. 1895, 1969–71. He was not operating as a special agent, and he did not have access to his badge or his service weapon. His supervisor, Assistant Special Agent in Charge (ASAC) Justin Oesterreich, offered encouragement, however, telling Mr. Siler things "looked good" for an eventual return to full duty based on his conversations with EPA leaders. *See* J.A. 1895–96, 1970–72.

*Mr. Siler's Protected Disclosures*

In late June 2015, shortly after Mr. Siler learned things "looked good" for him, Mr. Siler became involved in an investigation into his second-line supervisor, Special Agent in Charge (SAC) Randall Ashe.

SAC Ashe's conduct had previously been questioned. In 2010, an employee accused SAC Ashe of using threatening language and reporting for duty under the influence of alcohol. J.A. 1318. Though the subsequent investigation found "the evidence d[id] not substantiate misconduct that require[d] disciplinary action," *id.*, SAC Ashe admitted to using sexually inappropriate language, and was warned that such "offensive language, demeaning to women . . . will not be tolerated," *id.*

In 2014, SAC Ashe was again accused of conduct unbecoming a supervisor. J.A. 1302–06. The EPA's investigation substantiated eight separate specifications underlying that charge. J.A. 1303, 1320. Among other things, it found that SAC Ashe had made inappropriate sexual comments and had inappropriately touched a female subordinate. J.A. 1303. On July 28, 2015, then-CID Director Douglas Parker recommended a thirty-day suspension as a penalty. J.A. 1302. OCEFT Director Barnet ultimately mitigated that penalty and suspended SAC Ashe for fourteen days beginning in November 2015. J.A. 1319–21.

While the agency was considering the appropriate sanction for SAC Ashe, he was still in the office. On June 15, 2015, SAC Ashe touched a female employee on the shoulder and commented on her appearance. J.A. 1349–51, 1447–48. He acted oddly, miming hitting Mr. Siler with a box, *see* J.A. 1448, 1454–56, and Mr. Siler observed SAC Ashe asleep at his desk during work, *see* J.A. 1454–56, 1955–57. Concerned, an employee alerted ASAC Oesterreich of SAC Ashe's behavior.

ASAC Oesterreich interviewed those in the Office who had witnessed SAC Ashe's behavior, including Mr. Siler. J.A. 1447–59. Mr. Siler expressed fear of retaliation but reluctantly stated that SAC Ashe had been sleeping at his desk and had smelled of alcohol while on duty. *See* J.A. 1454–56, 1381–82. Others testified similarly, and one of Mr. Siler's co-workers provided a photograph Mr. Siler had taken of SAC Ashe asleep at his desk. J.A. 1346, 1447–59, 1955–57. Mr. Siler himself had deleted the photo "when he realized [it] was becoming an issue." J.A. 1456.

On July 2, 2015, ASAC Oesterreich transmitted his report, including Mr. Siler's statements, to agency leadership. J.A. 1446–59. Another investigation into SAC Ashe followed. *See* J.A. 978–80. During that investigation, SAC Ashe completed his earlier-ordered 14-day suspension and was instructed to telework. *See* J.A. 1735–36. In August 2016, after the agency concluded its investigation, CID Director Ted Stanich and OCEFT Director Barnet imposed a 14-day suspension. *See* J.A. 1313–17, 1360–62. SAC Ashe reached mandatory retirement age and retired prior to serving it. *See* J.A. 1736–37.

*The Administrative Investigation into Mr. Siler*

On July 15, 2015, roughly two weeks after receiving Mr. Siler's statement on SAC Ashe from ASAC Oesterreich, agency leadership met and initiated a supplemental administrative investigation into Mr. Siler's Original AK

business and his 2014 contractor dispute. *See, e.g.*, J.A. 1519–21, 1572–80. That administrative investigation concluded that Mr. Siler had (1) engaged in conduct unbecoming a criminal investigator by threatening a criminal report unless money was refunded to him and by parking his AK-47 parts on EPA property overnight; (2) improperly used his government computer for outside business; and (3) failed to report his outside business. J.A. 417–32; *see also* J.A. 60–64. On review of the administrative report, CID Director Stanich proposed, and OCEFT Director Barnet agreed, that Mr. Siler, only 11 months shy of eligibility for retirement, should be removed from his position. *See* J.A. 60–79. Director Barnet ordered Mr. Siler's removal less than two weeks before suspending SAC Ashe. J.A. 70, 1360.

### Mr. Siler's Appeal to the Board

A government employee removed from his position may appeal to the Board, *see* 5 U.S.C. § 7512; 5 C.F.R. § 1201.3(a)(1), and Mr. Siler did so. He argued that removal was not a reasonable penalty, and he asserted that his statements regarding SAC Ashe constituted protected whistleblowing that caused the agency to retaliate against him. *See* 5 U.S.C. § 1221.

Late in discovery, the agency produced undated draft notices of proposed sanctions against Mr. Siler. J.A. 1667, 1932. The drafts identified CID Director Stanich's predecessor, Mr. Parker, who retired before Mr. Siler was removed, as the decision maker, though the agency had previously represented that Mr. Parker was not involved in the decision to terminate Mr. Siler. *See* J.A. 1898, 1931–32; Oral Arg. at 7:02–9:05, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2017-2446.mp3. One draft suggested that Mr. Siler should be suspended, and another draft suggested that he should be removed. J.A. 1667, 1932.

Mr. Siler sought the transmittal emails to which these drafts had been attached, and the agency sought to claw back the drafts, claiming attorney-client privilege. *See* J.A. 1932; Oral Arg. at 9:06–10:00. Though Mr. Siler's discovery requests asked the agency to provide identifying information for any documents withheld on privilege grounds, J.A. 926; *see also* J.A. 854, the agency produced no privilege log for the drafts. The Administrative Judge (AJ) considered the privilege dispute at a hearing. In colloquy, counsel for the EPA represented that "[w]e don't know who drafted [the drafts]. . . . I suspect they were drafted by somebody in the HR department who assumed that Mr. Parker would be the proposing official." J.A. 1674. Based on these representations, the AJ ruled the drafts privileged, describing them as "clearly protected by the attorney-client privilege," and noting "the Agency is not required to produce their draft proposals. . . . because we want agencies to be very careful when they decide to . . . discipline." J.A. 1939–40.

After the hearing, the AJ affirmed the EPA's removal of Mr. Siler. The AJ found that Mr. Siler qualified as a whistleblower and that his disclosures contributed to his removal, but after considering the factors outlined in *Carr v. Social Security Administration*, 185 F.3d 1318 (Fed. Cir. 1999), the AJ held that the EPA would have removed Mr. Siler even without his protected disclosures. The AJ also determined that the agency acted reasonably when it removed Mr. Siler. The AJ's decision became the final decision of the Board, *see* 5 C.F.R. § 1201.113, and Mr. Siler timely sought review in this court, *see* 5 U.S.C. § 7703. He asserts that the Board erred in finding the draft disciplinary proposals privileged and that it misapplied the law governing whistleblower retaliation claims and reasonable penalties.

DISCUSSION

We have jurisdiction to review the Board's decisions. 28 U.S.C. § 1295(a)(9).  We may reverse only if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence."  *Cobert v. Miller*, 800 F.3d 1340, 1347–48 (Fed. Cir. 2015) (citing 5 U.S.C. § 7703(c)).

I

We first consider whether the Board erred in ruling the draft notices of proposed sanctions privileged.  At the Board, "[d]iscovery covers any nonprivileged matter that is relevant to the issues involved in the appeal."  5 C.F.R. § 1201.72(b).  As in district courts, a party who seeks to withhold discovery based on privilege has the burden of showing privilege applies.  *See, e.g.*, *In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1301 (Fed. Cir. 2016) ("The burden of determining which communications are privileged and which communications fall outside the scope of the privilege rests squarely on the party asserting the privilege."); *Danko v. Dep't of Def.*, 5 M.S.P.B. 435, 436 & n.4 (1981) (rejecting privilege claim where agency "failed to present any evidence" and noting agency "had the burden of showing it was privileged").  Though the Board has no rule requiring formal privilege logs, the Board has required the proponent of privilege "to provide sufficient information to establish that any documents withheld were privileged."  *See, e.g.*, *Gubino v. Dep't of Transp.*, No. AT-0752-97-0455-X-1, 2000 WL 352391, at *5 (M.S.P.B. Mar. 24, 2000).[1]

---

[1]    Moreover, in this case, Mr. Siler sought discovery regarding "information necessary to adjudicate the pro-

In this case, the agency sought to shield the draft proposals from discovery based on attorney-client privilege. The attorney-client privilege protects communications between a client and an attorney "for the purpose of obtaining legal advice or services." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000). An agency may be a "client" whose communications with its attorneys may be protected by the attorney-client privilege. *See, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) ("[I]t is clear that an agency can be a 'client' and agency lawyers can function as 'attorneys' within the relationship contemplated by the privilege . . . ."). But as with any other client, to claim attorney-client privilege, the agency must show that the allegedly protected communication was made in confidence, between it and its attorney, "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services [or (iii)] assistance in some legal proceeding." *Grimes v. Dep't of the Navy*, No. BN-1221-03-0163-B-1, 2005 WL 1523232, at \*5 (M.S.P.B. June 10, 2005) (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358–59 (D. Mass. 1950)); *see also Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1581 (Fed. Cir. 1985) ("Any government claim of privilege should be made with regard to specific documents . . . and specify the particular privilege claimed and the basis for its assertion.").

Here, the EPA made no such showing. It did not produce a privilege log or provide information—such as the documents' authors and recipients—that would have allowed the Board to evaluate whether attorney-client privilege shields the drafts. Indeed, rather than proving that the draft proposals embody confidential attorney

---

priety of" any privilege claim. J.A. 926; *see also* J.A. 854. The EPA did not object to this instruction. J.A. 857–76.

communications, the EPA's representations to the Board directly undermine its privilege claim. The agency informed the Board that it "d[id]n't know who drafted" the documents or when, and it speculated that "they were drafted by somebody in the HR department." J.A. 1674, 1938. Contrary to the government's assertions, *see, e.g.*, Resp't's Br. 55–56, the record contains no evidence that attorneys prepared—or even saw—these draft proposals.[2]

Having failed to show even the most basic aspect of attorney-client privilege—a communication with an attorney—the government's privilege claim fails. And in this case, we cannot say that the Board's refusal to consider the drafts could not have impacted the outcome of Mr. Siler's appeal. *See, e.g.*, *Becker v. Office of Pers. Mgmt.*, 853 F.3d 1311, 1315 (Fed. Cir. 2017) (explaining that we overturn the Board's privilege rulings with "proof of an error that 'caused substantial harm or prejudice' such that the outcome of the case could have been affected" (quoting *Curtin v. Office of Pers. Mgmt.*, 846 F.2d

---

[2]    The government's unyielding defense of this baseless position troubles the court. In its brief, the government repeatedly represented that EPA attorneys prepared the draft proposals, citing portions of the record that plainly do not support that contention. *See, e.g.*, Resp't's Br. 27, 30, 55, 56, 58. At oral argument, the government remained unable to support its position with any record evidence and, unsurprisingly, could not align its position with the actual record evidence—namely, that the EPA was unable to identify the documents' author and had suggested "somebody in the HR department." J.A. 1674, 1938; Oral Arg. at 19:50–27:03, 33:35–58. But the government nevertheless persisted. We again remind the government that "confessing error is not a sin." Oral Arg. at 27:48–28:12.

1373, 1379 (Fed. Cir. 1988))). We therefore reverse the Board's privilege ruling and remand for Mr. Siler to receive any documents withheld as privileged over his objection. As part of this discovery, Mr. Siler should receive copies of any transmittal emails that accompanied the draft proposals. He may also investigate the documents, including by reopening the record and deposing Mr. Parker and any additional witnesses first identified in the transmittal emails or draft proposals.

## II

We next consider the Board's decision that the EPA would still have removed Mr. Siler had he not engaged in whistleblowing. Whistleblower retaliation is an affirmative defense. Where, as here, the government does not dispute that whistleblowing contributed to the agency's decision to take adverse personnel action against an employee, the agency must prove it would have taken the same action absent the whistleblowing. *See* 5 U.S.C. § 1221(e)(2). Under *Carr*, the Board considers (1) "the strength of the agency's evidence in support of its personnel action;" (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision;" and (3) "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated" in deciding whether the agency has met that burden. *Carr*, 185 F.3d at 1323. If the agency fails to prove that it would have taken the same action absent whistleblowing, the Board must set aside the agency's penalty decision and order corrective action. *See* 5 U.S.C. § 7701(c)(2)(B) (stating that "the agency's decision may not be sustained . . . if the employee . . . shows that the decision was based on any prohibited personnel practice"); *see also* 5 U.S.C. § 2302(b)(8) (defining whistleblower retaliation as a "prohibited personnel practice"). The Board has no discretion to affirm a penalty tainted by illegal reprisal, even if the agency's penalty might other-

wise have been reasonable. *See* 5 U.S.C. § 7701(c)(2)(B); *Sullivan v. Dep't of the Navy*, 720 F.2d 1266, 1278 (Fed. Cir. 1983) (Nies, J., concurring) ("In an adverse action proceeding, . . . . the merits cannot be the determinative factor that there was no reprisal. *A meritorious adverse action must be set aside where there is reprisal.*" (emphasis added)). Here, Mr. Siler challenges the Board's treatment of *Carr* factors 3 and 2.

### *Carr* Factor 3

The *Carr* factors challenge the agency to prove that its employee would have been punished notwithstanding any whistleblowing. Thus, *Carr* factor 3 examines the agency's treatment of non-whistleblower employees accused of similar misconduct. *Carr*, 185 F.3d at 1323. The Board found that this factor favored the agency. J.A. 31. It considered two potential comparators—SAC Ashe and a Dallas employee removed for using government equipment to view child pornography—but it found neither sufficiently similar to make a "meaningful comparison." J.A. 29–30. Instead, it found "most telling" that the agency did not retaliate against other whistleblowers who offered testimony against SAC Ashe. J.A. 30–31.

In considering the other Ashe whistleblowers, the Board erred. The third *Carr* factor looks at "any evidence that the agency takes similar actions against employees who are *not whistleblowers* but who are *otherwise similarly situated*." *Miller v. Dep't of Justice*, 842 F.3d 1252, 1262 (Fed. Cir. 2016) (emphases added) (quoting *Carr*, 185 F.3d at 1323). Though the agency's treatment of other whistleblowers may illuminate any motive to retaliate under *Carr* factor 2, it does not show the agency's treatment of non-whistleblower employees accused of similar misconduct, the precise inquiry considered under *Carr* factor 3.

The Board also erred in finding that the third *Carr* factor favored the government. Once a whistleblower

shows that his protected disclosures contributed to adverse action against him, the agency bears the burden of showing that it would have acted in the same way even absent any whistleblowing. 5 U.S.C. § 1221(e)(2); *Miller*, 842 F.3d at 1257 (burdening the agency to prove independent causation by clear and convincing evidence). Though an agency need not introduce evidence of every *Carr* factor to prove its case, the "risk associated with having no evidence on the record" for a particular factor falls on the government. *Miller*, 842 F.3d 1262. The Board "may not simply guess what might happen absent whistleblowing." *Id.* It follows that where, as here, the Board finds an absence of relevant comparator evidence, the third *Carr* factor cannot favor the government.

We therefore vacate the Board's decision and remand for further consideration of the *Carr* factors. Though we do not disturb the Board's fact findings, on remand, the Board should provide sufficient explanation for its conclusion that SAC Ashe and Mr. Siler may not be meaningfully compared. While the precise wrongdoings by SAC Ashe and Mr. Siler differ, both men engaged in a pattern of offenses and the same deciding official disciplined both men for "conduct unbecoming." We remind the Board that "[d]ifferences in kinds and degrees of conduct between otherwise similarly situated persons within an agency can and should be accounted for to arrive at a well reasoned conclusion regarding *Carr* factor three." *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1373 (Fed. Cir. 2012).

## *Carr* Factor 2

The second *Carr* factor requires the Board to examine any evidence of retaliatory motive on the part of the deciding officials. We have previously explained that both direct and circumstantial evidence may "giv[e] rise to an inference of impermissible intent." *Fellhoelter v. Dep't of Agric.*, 568 F.3d 965, 971 (Fed. Cir. 2009).

Mr. Siler contends that the Board did not sufficiently consider the EPA's treatment of SAC Ashe in determining that "none of the relevant officials . . . had a strong motive to retaliate" under *Carr* factor 2. J.A. 27. The Board's decision contains nearly three full pages detailing the evidence it considered in arriving at that conclusion. J.A. 27–29. The Board noted that Mr. Siler had not returned to full duty when he became involved in the Ashe investigation, a fact it found supported testimony that agency officials had concerns about Mr. Siler's actions. J.A. 27. It explained that agency testimony revealed officials considered Mr. Siler's conduct serious, and that although Mr. Siler was told things "looked good" for him, "these comments were made before the . . . investigation had further developed the facts." J.A. 27–29. And it further found that no other Ashe whistleblowers faced retaliation and that the EPA ultimately penalized SAC Ashe. *Id.* The Board, however, did not address whether the agency's mild treatment of SAC Ashe suggests that he was sufficiently well-liked to provide a motive to retaliate against Mr. Siler. We do not hold that the Board erred in its findings or that its ultimate conclusion was incorrect, but on remand, the Board should consider this issue.

### III

Finally, we address the Board's decision that the EPA reasonably removed Mr. Siler. In determining the reasonableness of the penalty imposed by an agency, the Board considers the factors outlined in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 (1981). Mr. Siler assigns error to the Board's consideration of several *Douglas* factors, including the "consistency of the penalty with those imposed upon other employees for the same or similar offenses." *Id.* at 332. Without reaching his specific arguments, we vacate this portion of the Board's opinion.

Our decision on Mr. Siler's privilege and *Carr* factor challenges counsels this result. If on remand, with a proper assessment of the *Carr* factors, the Board concludes the agency would not have removed Mr. Siler absent his protected disclosures, the Board must order corrective action and the agency's removal may not stand, notwithstanding the Board's *Douglas* analysis. *See* 5 U.S.C. § 7701(c)(2)(B); *cf. Briley v. Nat'l Archives & Records Admin.*, 236 F.3d 1373, 1378 (Fed. Cir. 2001) ("If a plaintiff establishes a prima facie case of retaliation for whistleblowing, corrective action *must be ordered unless* 'the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.'" (emphasis added) (quoting 5 U.S.C. § 1221(e)(2))). And if on remand the Board concludes otherwise, it may need to analyze the *Douglas* factors in light of additional evidence that emerges from the further discovery we have ordered. Of course, if Mr. Siler presents no new relevant evidence, the Board may reaffirm its existing analysis, which may be subject to a new appeal.

## CONCLUSION

Having found the parties' remaining arguments unpersuasive, we vacate the Board's decision and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

## COSTS

Costs to Petitioner.