**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

TRINITY LYNN INGRAM-JONES,
            Appellant,

       v.

DEPARTMENT OF THE ARMY,
            Agency.

DOCKET NUMBERS
AT-1221-14-0633-W-2
AT-1221-15-0313-W-1
AT-0752-15-0340-I-1

DATE: February 23, 2023

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Joyce E. Kitchens, Esquire, Atlanta, Georgia, for the appellant.

Stuart A. Miller, Esquire, Locust Grove, Georgia, for the appellant.

Gedety Serralta, Esquire, and Jason B. Myers, Esquire, Washington, D.C.,
   for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

**FINAL ORDER**

¶1        The appellant has filed a petition for review of the initial decision, which denied her request for corrective action in these two joined individual right of action (IRA) appeals and dismissed her involuntary resignation claim for lack of jurisdiction.   For the reasons set forth below, we GRANT the appellant's petition for review and AFFIRM the initial decision AS MODIFIED. Specifically, we REVERSE the administrative judge's finding that the alleged changes to the appellant's duties, responsibilities, and working conditions are not covered by 5 U.S.C. § 2302(a)(2)(A)(xii).   We FIND that the appellant established a prima facie case of whistleblower reprisal because she proved that her protected disclosures and protected activity were contributing factors to the significant change in duties, responsibilities, and working conditions; FIND that the agency failed to prove by clear and convincing evidence that it would have taken the personnel actions even in the absence of the appellant's protected disclosures and protected activity; and GRANT the appellant corrective action.

**BACKGROUND**

¶2        The appellant was employed by the agency as a Nurse Specialist (Case Manager), GS-0610-12, and was the Sexual Assault Medical Management Program Manager at the Winn Army Community Hospital (WACH) in Fort Stewart, Georgia.  *Ingram-Jones v. Department of the Army*, MSPB Docket No. AT-1221-14-0633-W-2, Appeal File (W-2 AF), Tab 12  at 46-47.   From July 2012 through April 2014, her first-line supervisor was R.M., and from April 2014 until her resignation, her first-line supervisor was C.H.   Hearing Transcript (HT) at 8, 115-16 (testimony of R.M. and C.H.).   The appellant's second-line supervisor was the WACH Commander.  W-2 AF, Tab 12 at 9.

¶3        On September 14, 2013, a WACH employee requested the appellant's assistance to examine a 4-year-old child for signs of physical abuse.  W-2 AF, Tab 13 at 18-19.  The appellant examined the child on September 16, 2013, and

she observed a right foot fracture and scars on his hands and leg, which she believed were consistent with cigarette burns. *Id*. at 27. After the examination, she contacted WACH's Social Work Services (SWS), the primary point of contact in child abuse cases that is responsible for intake, investigation, and case management, W-2 AF, Tab 44 at 29, and offered to provide a report she had prepared regarding the alleged abuse, including photographs and detailing the injuries discovered from the examination, W-2 AF, Tab 43 at 44-45, 48. The case proceeded to the Case Review Committee (CRC), which determines whether concerns of child abuse under its purview warrant recommending Government action. W-2 AF, Tab 44 at 29; HT at 396 (testimony of the appellant). The CRC did not substantiate the case of physical abuse. W-2 AF, Tab 13 at 23-24. Soon thereafter, the appellant learned that SWS representatives to CRC, in concert with a representative from the state's Department of Children and Family Services, downplayed the evidence of abuse and the seriousness of the child's foot injury. *Id*. at 24. Further, she was told that the SWS employee to whom she had offered her report with photographs falsely stated to the CRC that there were no such reports or photographs. *Id*.

¶4        On November 6, 2013, the appellant emailed the Chief of Staff, 3rd Infantry Division, informing him of her colleagues' conduct. W-2 AF, Tab 32 at 5-18. The next day, the appellant emailed the agency's Inspector General (IG) repeating her allegations. W-2 AF, Tab 13 at 16-37. She also informed R.M. of her complaints to the Chief of Staff and the IG. *Id*. at 37-38.

¶5        As a result of these complaints, the Commanding General of the U.S. Army Medical Command (MEDCOM) ordered an investigation pursuant to Army Regulation 15-6 (15-6 investigation). W-2 AF, Tab 43 at 5-8. The investigating officer issued a report that validated some of the appellant's claims that SWS understated the evidence of abuse to the CRC. *Id*. at 32-33. Specifically, the report noted that SWS members failed to indicate that during a forensic interview conducted by the appellant, the child stated that his father "burned him with a

white stick." *Id*. The 15-6 investigation also revealed that multiple sources felt that the appellant routinely exceeded her scope of practice by "dictating what each organization should do in each case." *Id*. at 34. The investigating officer recommended that WACH leadership clearly define the roles and expectations of all parties involved, including the appellant. *Id*. The WACH commander delegated these instructions to R.M. to ensure that the recommendations be carried out. *Ingram-Jones v. Department of the Army*, MSPB Docket No. AT-1221-14-0633-W-1, Initial Appeal File (IAF), Tab 17 at 38-39.

¶6      Around the same time that the investigation began, the appellant alleged that R.M. provided false information to the credentialing committee and documented with the committee that the appellant was the subject of the 15-6 investigation. IAF, Tab 5 at 22-23. Following the completion of the investigative report, on January 10, 2014, R.M. convened a meeting with the appellant, some of her colleagues, and C.H. to review the investigation's results and discuss its instructions. *Id*. at 86-88. In the appellant's view, R.M. became hostile with her, lectured her for going outside the chain of command with her complaints, and embarrassed her in front of her colleagues. *Id*. at 32-35. The appellant alleged that following the meeting, R.M. restricted her practice by prohibiting her from seeing pediatric nonsexual abuse patients. *Id*. at 33.

¶7      The appellant also alleged that, over the next several months, the agency denied her training request for a forensic nursing conference, threatened to suspend her credentials, and attempted to rewrite her position description. W-2 AF, Tab 6 at 12-13, 23. She further alleged that the agency failed to promote her from a GS-12 level to a GS-13 level and reduced her retention incentive benefit. *Id*. at 25, 56. The appellant also noticed that over the course of several months, many of her job duties changed. *Id*. at 11-26. She believed that the agency reassigned her policy-writing duty to another employee and prohibited her from arranging outside agreements with state-run facilities. *Id*. at 23-24, 57. The agency also changed the training the appellant was conducting at WACH and

prohibited her from performing pediatric sexual assault evaluations.  W-2 AF, Tab 17 at 65, 106-09.

¶8    Throughout that time, the appellant filed two complaints with the Office of Special Counsel (OSC) claiming that the agency's actions were taken in retaliation for her disclosures to the Chief of Staff, 3rd Infantry Division, and to the IG.  IAF, Tab 5 at 23; W-2 AF, Tab 6 at 6-21.  OSC terminated its investigations and notified the appellant of her right to seek corrective action from the Board.  IAF, Tab 5 at 16; W-2 AF, Tab 6 at 22-27.  In January 2015, the appellant informed the agency of her intent to resign.  *Ingram-Jones v. Department of the Army*, MSPB Docket No. AT-0752-15-0340-I-1, Initial Appeal File (0340 IAF), Tab 6 at 16-18.[2]  As a result of her OSC complaints and resignation, the appellant filed two IRA appeals and an involuntary resignation appeal with the Board.  IAF, Tab 1; *Ingram-Jones v. Department of the Army*, MSPB Docket No. AT-1221-15-0313-W-1, Initial Appeal File, Tab 1; 0340 IAF, Tab 1.  The administrative judge joined the three appeals.  W-2 AF, Tab 3.  After holding a hearing, the administrative judge issued an initial decision denying corrective action in both IRA appeals and dismissing the involuntary resignation appeal for lack of jurisdiction.  W-2 AF, Tab 50, Initial Decision (ID).

¶9    The appellant has filed a petition for review.  Petition for Review (PFR) File, Tab 3.  The agency has filed an opposition, to which the appellant has replied.  PFR File, Tabs 7-8.

---

[2] The effective date of the appellant's resignation was January 31, 2015.  0340 IAF, Tab 6 at 16-18.

**DISCUSSION OF ARGUMENTS ON REVIEW**

<u>The appellant proved that the agency took personnel actions under 5 U.S.C. § 2302(a)(2)(A).</u>

¶10    When reviewing the merits of an IRA appeal,[3] the Board must determine whether the appellant has established by preponderant evidence that she made a protected disclosure or engaged in a protected activity that was a contributing factor in a personnel action taken against her. 5 U.S.C. § 1221(e)(1); *Lu v. Department of Homeland Security*, 122 M.S.P.R. 335, ¶ 7 (2015). A preponderance of the evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

¶11    Under the Whistleblower Protection Act (WPA), a "personnel action" is defined as an appointment; a promotion; an action under 5 U.S.C. chapter 75 or other disciplinary or corrective action; a detail, transfer, or reassignment; a reinstatement; a restoration; a reemployment; a performance evaluation under 5 U.S.C. chapter 43 or under Title 38; a decision about pay, benefits, or awards or concerning education or training if the education or training reasonably may be expected to lead to an appointment, promotion, performance evaluation, or other action described in 5 U.S.C. § 2302(a)(2)(A); a decision to order psychiatric testing or examination; the implementation or enforcement of any nondisclosure policy, form, or agreement; and any other significant change in duties, responsibilities, or working conditions. 5 U.S.C. § 2302(a)(2)(A); *Skarada v. Department of Veterans Affairs*, 2022 MSPB 17, ¶ 14.

---

[3] In the initial decision, the administrative judge determined that the appellant established jurisdiction over her IRA appeals because she exhausted her administrative remedy with OSC for both IRA appeals and nonfrivolously alleged the requisite jurisdictional elements. ID at 22-23; *see Bradley v. Department of Homeland Security*, 123 M.S.P.R. 547, ¶ 6 (2016). We find no reason to disturb these findings, which neither party challenges on review.

¶12     The appellant alleged that the agency took the following personnel actions against her in reprisal for her disclosures: failed to promote her from a GS-12 position to a GS-13 position, decreased her retention incentive, suspended and revoked her credentials, denied a training request, and proposed changing her position description. W-2 AF, Tab 35 at 3-4. She also alleged that the agency removed the following job duties: performing forensic pediatric sexual assault evaluations; treating pediatric nonsexual abuse patients; policy writing; conducting local training courses; negotiating memoranda of understanding (MOUs) and memoranda of agreement (MOAs); and collaborating with outside agencies regarding the sexual assault patient population. *Id.* The administrative judge found that the decreased retention incentive constituted a personnel action under section 2302(a)(2)(A)(ix) because it was a decision concerning the appellant's pay. ID at 38-39. He also found that removing the appellant's duty to perform forensic pediatric sexual assault evaluations was a significant enough change in duties to constitute a personnel action under section 2302(a)(2)(A)(xii). ID at 42-43. In conjunction, he found that C.H.'s failure to seek an exception to ending WACH's forensic pediatric sexual assault evaluations also constituted a personnel action. ID at 43. The administrative judge found that none of the other alleged actions constituted personnel actions under section 2302(a)(2)(A). ID at 26-45.

¶13     On review, the appellant argues that the administrative judge erred in finding that only two of the alleged agency actions constituted personnel actions under section 2303(a)(2)(A). PFR File, Tab 3 at 15-31. We agree with the administrative judge's findings that the failure to promote, the proposed change in her position description, and the suspension of her credentials do not constitute personnel actions under section 2303(a)(2)(A). We also agree with the administrative judge that the appellant failed to prove that the agency removed her duty to draft MOUs and MOAs and to coordinate with outside organizations. We will not disturb those findings here. However, we find that the administrative

judge erred in his analysis of the appellant's change in duties. After our review of the record, we find that the appellant proved that she suffered a significant change to her job duties, responsibilities, and working conditions and that such a change constitutes a personnel action under section 2302(a)(2)(A)(xii). We address each action in turn below.

*Failure to Promote*

¶14    Regarding the appellant's failure to promote claim, she argues that in 2014, all other nurse practitioners in the organization were promoted to GS-13 positions but that C.H. created and planned to advertise a GS-13 position to which she would have to apply. PFR File, Tab 3 at 15-16. C.H. stated that he was aware of the appellant's desire for more clinical work, W-2 AF, Tab 16 at 37, and he testified that to accommodate that desire, he would need to increase her grade from a GS-12 to a GS-13, HT at 132-33 (testimony of C.H.). He further testified that he did not have the authority to promote the appellant from a GS-12 to a GS-13, *id*., so he approached her with the idea that he would create a GS-13 position to which she could apply that allowed for more clinical time, W-2 AF, Tab 16 at 37, 40. The appellant rejected C.H.'s proposition. *Id.* at 40.

¶15    In previous cases in which the Board has considered whether a failure to promote was a personnel action under the WPA, the agency had announced a vacancy and filled it with another individual or canceled the vacancy. *See Ruggieri v. Merit Systems Protection Board*, 454 F.3d 1323, 1325-27 (Fed. Cir. 2006) (holding that, in the context of an appointment, the agency's decision to terminate the hiring process by canceling the vacancy announcement was sufficient under the plain language of the statute to constitute a "fail[ure] to take . . . a personnel action"); *Briley v. National Archives and Records*

*Administration*, [71 M.S.P.R. 211](#), 221 (1996).[4]  Here, there was no vacancy announcement, and, although the agency intended to create one, it is undisputed that the appellant rejected the opportunity to apply for the position.  Under these circumstances, we find there to be no personnel action.

¶16     To the extent that the appellant argues that she should have been promoted because other nurses were promoted from a GS-12 to a GS-13, we find this argument to be without merit.  The administrative judge found that because there was no vacancy at issue here, the appellant's argument effectively constituted a claim of a failure to reclassify from a GS-12 grade to a GS-13 grade.  ID at 38.  To prove that a failure to reclassify the appellant's position constitutes a personnel action under section 2302(a)(2)(A), she must prove that comparable positions had been reclassified elsewhere by the agency because of a change in the classification standards or a classification error and that she would have met the legal and qualification requirements for promotion.  *Briley*, 71 M.S.P.R. at 221-22.

¶17     We need not address whether the appellant would have met the legal and qualification requirements for a promotion because her allegation is that other nurse practitioners were promoted to the GS-13 grade—not that they were reclassified.  PFR File, Tab 3 at 15-16.  Regardless, if she had alleged that the other nurse practitioners were reclassified, she presented no evidence that they were in a similar enough position or shared similar enough duties that such a comparison would be relevant.  Accordingly, we agree with the administrative

---

[4] Historically, the Board has been bound by the precedent of the U.S. Court of Appeals for the Federal Circuit on these types of whistleblower issues.  However, pursuant to the All Circuit Review Act, Pub. L. No. 115-195, 132 Stat. 1510, appellants may file petitions for judicial review of Board decisions in whistleblower reprisal cases with any circuit court of appeals of competent jurisdiction.  *See* [5 U.S.C. § 7703](#)(b)(1)(B).  Therefore, we must consider these issues with the view that the appellant may seek review of this decision before any appropriate court of appeal.

judge's conclusion that the appellant failed to prove by preponderant evidence that the agency's actions or inactions regarding a promotion constitute a personnel action under section 2302(a)(2)(A).

*Threatened Changes to Position Description*

¶18        The appellant also alleges, as a separate personnel action, that C.H. threatened to change her position description when he created the tentative position description for the GS-13 position. PFR File, Tab 3 at 28; HT at 428-30 (testimony of the appellant). At the hearing, C.H. testified that WACH needed more medical providers for its clinics, so he and R.M. decided to rewrite the appellant's position description to include more clinical time and have a discussion with her about whether she found it acceptable. HT at 132-33 (testimony of C.H.). The record shows that C.H. already was aware that the appellant wanted more clinical time, and he was trying to facilitate that request, W-2 AF, Tab 16 at 37, but he acknowledged that the new position description would lessen the amount of time the appellant spent on sexual assault cases, HT at 136-37 (testimony of C.H.). Because the appellant was not receptive to the new position description, however, C.H. did not pursue it any further, and no changes were made to her current position description. HT at 180 (testimony of C.H.), 498-99 (testimony of the appellant); W-2 AF, Tab 16 at 74-75.

¶19        The administrative judge found that C.H.'s act of offering a new position description for the appellant's review did not qualify as a personnel action because she was not required to compete for the position, and therefore, it did not constitute a "threat." ID at 45; 5 U.S.C. § 2302(b)(8). On review, the appellant highlights several conversations between herself, C.H., and other employees regarding the tentative position description. PFR File, Tab 3 at 25-28. We have reviewed these conversations and find that they do not change the outcome arrived at by the administrative judge. Although the Board has held that the term "threaten" in section 2302 should be interpreted broadly, *Campo v. Department of the Army*, 93 M.S.P.R. 1, ¶ 5 (2002), the ultimate decision on whether C.H. would

pursue the new position description was left to the appellant. C.H. forwarded the new position description to the appellant "to gauge her interest," W-2 AF, Tab 16 at 63, and when she objected, he no longer pursued it, HT at 180 (testimony of C.H). Even considering the broad interpretation afforded the term "threaten," we agree with the administrative judge's finding that these actions do not constitute a personnel action under section 2302(a)(2)(A).

*Suspended Credentials*

¶20 Regarding the appellant's suspended credentials claim, she alleges that C.H. conducted an internet search of her name and discovered that she had been arrested on a domestic violence charge in July 2012. PFR File, Tab 3 at 17-18; HT 449-50 (testimony of the appellant). She claims that she immediately provided him with documentation showing that the arrest was in error and that she was actually the victim of the domestic incident in question. W-2 AF, Tab 17 at 189-96. She asserts that C.H. nevertheless arranged for pediatric evaluations, which were normally performed by the appellant, to be performed at another hospital until the issue of the arrest and its effect on the appellant's credentials could be worked out. *Id*. at 189-90. The appellant argues that these actions resulted in the suspension of her credentials. PFR File, Tab 3 at 17-18.

¶21 At the hearing, C.H. testified that he typed the appellant's name into a search engine after unsuccessfully attempting to view an internet link she sent him regarding her qualifications. HT at 146 (testimony of C.H.). He testified that the internet search produced an arrest history naming the appellant. *Id*. He further testified that a human resources official recommended holding the appellant's credentials in abeyance until the matter could be investigated but that the appellant provided him with the paperwork proving that the arrest was in error. HT at 152-55 (testimony of C.H.). C.H. testified that, because these events occurred over the weekend, he never signed the paperwork that would have formally actuated the abeyance. HT at 156 (testimony of C.H.). The administrative judge found that the appellant did not meaningfully rebut this

testimony, and, therefore, found that there was no suspension of the appellant's credentials. ID at 39-40.

¶22 On review, the appellant's argument seems to focus more on the internet search than the alleged suspended credentials. PFR File, Tab 3 at 17-18. She argues that the search was unwarranted because C.H. had access to her credentialing file, which included two of her background checks, and that the administrative judge erred in finding nothing improper about the search.[5] *Id.*; ID at 56. We find the appellant's arguments unpersuasive, as she did not contest C.H.'s claim that her credentials were never actually put in abeyance or suspended. Further, even if the internet search was improper, the appellant has failed to show that this action constitutes a personnel action under section 2302(a)(2)(A). Accordingly, we agree with the administrative judge's finding that the appellant failed to prove that the agency suspended her credentials.

*Negotiating MOUs and MOAs and Collaborating with Outside Agencies*

¶23 The appellant also alleges that the agency removed or reassigned her duties of negotiating MOUs and MOAs for sexual assault patients and collaborating with outside agencies regarding the sexual assault patient population. W-2 AF, Tab 12 at 49-50. The administrative judge found that the appellant did not present sufficient evidence to prove that these duties were significant or that they were actually removed from her responsibilities. ID at 43. We have thoroughly reviewed the record, which appears to show disagreement and confusion between the agency and the appellant concerning the status of these duties and the

---

[5] The administrative judge's findings regarding the appropriateness of the internet search were in relation to his analysis of the appellant's involuntary resignation claim. ID at 51, 56. Because the same facts surrounding these allegations apply to both the appellant's IRA claims and her involuntary resignation claim, we find the administrative judge's findings to be relevant in both instances.

appellant's performance of them, W-2 AF, Tab 17 at 132-34, Tab 18 at 56, and agree with the administrative judge's conclusions. Therefore, we find that the appellant has failed to prove that these alleged actions constituted a personnel action.

*Denial of Training Request*

¶24     The appellant also alleges that the agency subjected her to a personnel action when it denied her a training request. PFR File, Tab 10 at 10. Although it is undisputed that the agency denied the training request, the Board has held that, within the meaning of the WPA, a decision concerning training qualifies as a "personnel action" only if the training reasonably may be expected to lead to an appointment, a promotion, a performance evaluation, or some other action described in 5 U.S.C. § 2302(a)(2)(A). *Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 28 (2011). The administrative judge considered this argument below and found that the appellant failed to provide any meaningful evidence or argument that the denied training would reasonably have been expected to lead to any of the actions outlined in section 2302(a)(2)(A). ID at 40-41. We have reviewed the record, and we agree. Therefore, we find that the appellant's training denial does not constitute a personnel action.

*Decrease in Retention Incentive*

¶25     The appellant has asserted that the agency decreased her retention incentive from 20% to 15%, a claim undisputed by the agency. In the initial decision, the administrative judge found that this affected the appellant's pay and awards and, thus, constituted a personnel action pursuant to 5 U.S.C. § 2302(a)(2)(A)(ix). ID at 38-39. Neither party has disputed this ruling on review, and we find no reason to disturb it.

*Significant Change in Duties, Responsibilities, or Working Conditions*

¶26     The appellant also alleged that she experienced a significant change in duties, responsibilities, or working conditions as contemplated by

section 2302(a)(2)(A)(xii).[6]  W-2 AF, Tab 35 at 3-4.  She alleged that after she made her disclosures in November 2013, the agency prohibited her from treating pediatric nonsexual abuse patients and ultimately from performing forensic pediatric sexual assault evaluations.  *Id.*  She also alleges that the agency assigned her policy-writing duties to other employees and ended the local training sessions she conducted.  *Id.*

¶27      The administrative judge considered each duty separately, and he found that the only significant change in duty that constituted a personnel action under section 2302(a)(2)(A) was removing her duty to perform forensic pediatric sexual assault evaluations.  ID at 42-43.  He found that limiting the appellant from seeing pediatric nonsexual abuse patients did not constitute a significant change in duty because it was not her duty in the first instance.  ID at 26-37.  He also found that none of the other alleged change in duties, standing alone, constituted a "significant change in duties, responsibilities, or working conditions" as contemplated by section 2302(a)(2)(A)(xii).  ID at 41-45.

¶28      When determining whether an appellant has suffered a "significant change in duties, responsibilities, or working conditions," the Board considers the alleged agency actions both collectively and individually.  *Skarada*, 2022 MSPB 17, ¶ 16; *see also Holderfield v. Merit Systems Protection Board*, 326 F.3d 1207, 1209-10 (Fed. Cir. 2003).  Although it may be questionable whether any actions, standing

---

[6] In the appellant's initial IRA appeal, she alleged that she suffered from a hostile work environment.  IAF, Tab 4 at 4.  The administrative judge did not include a hostile work environment claim in his summary of the issues, W-2 AF, Tab 35 at 3-4, and the appellant does not appear to have objected to that summary, *id.* at 1.  The initial decision does not include a discussion of a hostile work environment claim, and only in the appellant's reply to the agency's response to her petition for review, not in her initial petition, does she raise the issue of a hostile work environment again.  PFR File, Tab 8 at 3-4.  Nonetheless, we will consider the appellant's claims here as they relate to her working conditions.  *See Savage v. Department of the Army*, 122 M.S.P.R. 612, ¶ 23 (2015), *overruled in part by Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶¶ 23-25.

alone, amount to a "significant change in duties, responsibilities or working conditions," the alleged changes may nevertheless constitute a personnel action under section 2302(a)(2)(A)(xii) if considered collectively. Here, we find that the administrative judge erred by failing to consider collectively the alleged changes in the appellant's duties. Thus, the relevant inquiry on review is whether the appellant's allegations, collectively, constitute a "significant change in duties, responsibilities, or working conditions."

¶29    The Board has held that a significant change in duties should be construed broadly. *Ingram v. Department of the Army*, 116 M.S.P.R. 525, ¶ 4 (2011). Additionally, after issuance of the initial decision, the Board issued its decision in *Skarada*, 2022 MSPB 17, wherein it further interpreted the meaning of the statutory language, "significant change in duties, responsibilities, or working conditions," and held that to constitute a "significant change" under section 2302(a)(2)(A)(xii), an agency action must have a significant impact on the overall nature or quality of an employee's working conditions, responsibilities, or duties. *Skarada*, 2022 MSPB 17, ¶ 15. After our thorough review of the record, we find that the appellant experienced a change in her duties, responsibilities, and working conditions and that change had a significant impact on the nature of her duties and responsibilities, and on the quality of her working conditions. Therefore, we find that the appellant suffered a personnel action under section 2302(a)(2)(A)(xii).

¶30    Regarding the appellant's duty to treat pediatric nonsexual abuse patients, she testified that after making her disclosures, R.M. prohibited her from seeing any pediatric nonsexual abuse patients and that 4 months later, her new supervisor, C.H., permitted her to see those patients only after seeking approval. HT at 418, 488 (testimony of the appellant). Several months later, C.H. again instructed the appellant to refrain from seeing pediatric nonsexual abuse patients. W-2 AF, Tab 17 at 57. The appellant further testified that this limitation decreased the total number of patients she saw and that the decrease was a

significant change from previous years. HT at 480, 487-89 (testimony of the appellant). She also testified that limiting her ability to see those patients could impact her credentials, which she was required to maintain to hold her position. HT at 425-26, 429 (testimony of the appellant).

¶31    Discussing this alleged change in duty in isolation, the administrative judge provided an 11-page analysis ultimately concluding that treating pediatric nonsexual abuse patients was not the appellant's duty in the first instance because it was not included in her position description nor was it assigned or instructed by a supervisor. ID at 26-37. We disagree. The Board has held that when a question is raised regarding the nature and character of the duties performed and a review of the position description may be inadequate, it will consider all factors having a bearing upon the totality of the circumstances concerning the duties performed. *Lara v Department of Homeland Security*, 101 M.S.P.R. 190, ¶ 9 (2006).

¶32    Here, the appellant's position description outlines duties related to "sexual assault and abuse." W-2 AF, Tab 12 at 47. The appellant testified that this language implies duties related to sexual assault and general physical abuse. HT at 479-80 (testimony of the appellant). Testimony from agency officials seems to support this interpretation. The Chief of Pediatrics testified that one could not be a sexual abuse expert without seeing physical abuse, that sexual abuse is physical abuse, and that differentiating between the two would be very difficult. HT at 228 (testimony of S.B.). A WACH pediatrician testified it was "normal business" to consult with the appellant on pediatric nonsexual abuse cases because she was the "local child abuse expert." HT at 344-45 (testimony of A.M.). R.M. testified that he would expect the appellant to have the same role in any type of abuse case as any other pediatric provider. HT at 55-56 (testimony of R.M.). C.H.'s 2014 evaluation of the appellant and his corresponding testimony also reference the appellant's duties related to "abuse and sexual assault patients." W-2 AF, Tab 12 at 16; HT at 120-21 (testimony of C.H.).

¶33      Moreover, it is undisputed that both R.M. and C.H. were aware that the appellant was performing this duty, and R.M. praised her for her willingness to go "out of her own lane." W-2 AF, Tab 12 at 10; HT at 31, 50, 415-16 (testimony of R.M. and the appellant). Although the administrative judge found this comment to be in reference to the Chief of Staff, 3rd Infantry Division, and the IG issues, we discern no basis for that finding, as R.M. testified that he wrote the comments on October 31, 2013—a week before the appellant made her disclosures. HT at 29, 31-33 (testimony of R.M.); W-2 AF, Tab 13 at 16-38. Accordingly, we reverse the administrative judge's findings and hold that treating pediatric nonsexual abuse patients was a part of the appellant's duties and responsibilities and that, even standing alone, the circumstances outlined above demonstrate a "significant change in duties, responsibilities, or working conditions" under section 2302(a)(2)(A)(xii).

¶34      Regarding forensic pediatric sexual assault evaluations, W-2 AF, Tab 12 at 50, the appellant testified that this duty comprised approximately 50% of her job and "was a huge part of [her] whole life" before the agency eliminated it, HT at 421, 514 (testimony of the appellant). The administrative judge found that eliminating this duty, and C.H's failure to seek an exception to the cessation, constituted personnel actions independent of any other apparent change in duties. ID at 43. We agree, and we find no reason to disturb these findings. Regarding her role in policy drafting, W-2 AF, Tab 12 at 9, 47, the appellant testified that sexual assault was a prevalent issue in the Army, and prior to her disclosures, she was "constantly trying to keep up" with the guidance from the Department of Defense in writing policy, but after her disclosures, others were asked to write and update policy, HT at 418-20 (testimony of the appellant); W-2 AF, Tab 17

at 29-30.[7]    The administrative judge found that a change in duties "unquestionably occurred," but that on its own, it did not rise to the level of "significant." ID at 42.  Regarding the training instruction, the appellant testified that she provided "award winning" training programs, W-2 AF, Tab 12 at 9, 50; HT at 432, 507 (testimony of the appellant), which took up a significant amount of her time, but after her disclosures, she was no longer permitted to provide the training,  HT at 507 (testimony of the appellant).  The administrative judge made no finding on whether this constituted a personnel action and only found that the appellant's disclosures were not a contributing factor to the agency's removing this duty.  ID at 44-45.  Regarding general working conditions, *supra* ¶ 26 & n.6, the appellant testified that implementing these changes occurred "behind her back," that her supervisors "started acting like they didn't know who [she] was," and that they would not respond to her concerns.  HT at 432-33 (testimony of the appellant).  She further testified that the significant change in duties led others to believe she was no longer in charge of the sexual assault program at WACH.  HT at 516 (testimony of the appellant).

¶35        After careful consideration, we find that the appellant has demonstrated that, collectively, these changes had a significant impact on the overall nature or quality of her responsibilities, duties, and working conditions.  *See Skarada*, 2022 MSPB 17, ¶ 15.  Many of these changes directly relate to the essence of the appellant's position not only as the Sexual Assault Medical Management Program Manager, W-2 AF, Tab 12 at 46-47, but also as a nurse practitioner, *id*. at 53, and, thus, had an impact on the overall nature of her duties and responsibilities.  Accordingly, we find that the significant changes in the appellant's duties,

---

[7] The appellant testified that she still had input in the policy but was no longer writing it.  HT at 509 (testimony of the appellant).

responsibilities, and working conditions constitute a personnel action under section 2302(a)(2)(A)(xii).

The appellant made protected disclosures and engaged in protected activity.

¶36     Having narrowed the scope of what personnel actions the appellant proved, we now turn to the question of whether she proved by preponderant evidence that she made protected disclosures under 5 U.S.C. § 2302(b)(8) or engaged in protected activity under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  5 U.S.C. § 1221(e)(1); *Corthell v. Department of Homeland Security*, 123 M.S.P.R. 417, ¶ 8 (2016).  To establish that she made a protected disclosure, the appellant must show that she reasonably believed that the conduct being disclosed evidenced a violation of any law, rule or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.  5 U.S.C. § 2302(b)(8)(A); *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285, ¶ 18 (2013).  The administrative judge found that the appellant reasonably believed that her allegations about the improper handling of the child abuse case were accurate and that those disclosures evidenced an allegation of an abuse of authority.  ID at 25.  Thus, he found that the appellant made protected disclosures under section 2302(b)(8).  Neither party has challenged this finding on review, and we find no reason to disturb it.

¶37     Although the administrative judge considered whether the appellant made a protected disclosure, he failed to consider whether the appellant engaged in protected activity.  ID at 23-25.  Among the activities contemplated by section 2302(b)(9) is "cooperating with or disclosing information to the Inspector General, . . . or the Special Counsel, in accordance with applicable provisions of law."  5 U.S.C. § 2302(b)(9)(C).  Here, there is no dispute that the appellant disclosed information to the IG when she filed her complaint in November 2013 expressing her concerns over the CRC and SWS.  Therefore, we find that the appellant engaged in protected activity under section 2302(b)(9)(C), and we modify the initial decision in that regard.

<u>The appellant's protected disclosures and protected activity were contributing factors in the significant change in her duties, responsibilities, and working conditions.</u>

¶38    Having found that the significant change in the appellant's duties, responsibilities, and working conditions and the reduction in her retention incentive constituted personnel actions under 5 U.S.C. § 2302(a)(2)(A), we next consider whether the appellant's protected disclosures and protected activity were contributing factors to these actions. 5 U.S.C. § 1221(e)(1); *Lu,* 122 M.S.P.R. 335, ¶ 7. The most common way for an appellant to prove that a protected disclosure was a contributing factor in the agency's taking of a personnel action is the knowledge/timing test. *Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 21 (2016). That test requires the appellant to prove that the agency official taking the personnel action knew of the whistleblowing disclosure or protected activity and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure or activity was a contributing factor to the personnel action. *Id*. Once the appellant has satisfied the knowledge/timing test, she has demonstrated that a protected disclosure or protected activity was a contributing factor in the personnel action, even if a complete analysis of all of the evidence would not support such a finding. *Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250, ¶ 20 (2008).

¶39    Regarding the reduction in the appellant's retention incentive from 20% to 15%, the administrative judge found that C.H. only had the authority to approve a 15% retention incentive and that only MEDCOM headquarters could approve a 20% retention incentive, which C.H. recommended. ID at 46-47. Thus, the administrative judge found that the appellant failed to establish who was responsible for taking the action and that she, therefore, failed to establish that her protected disclosures or protected activity were a contributing factor to the reduced retention incentive. *Id*. On review, the appellant argues that WACH, and specifically C.H., intentionally failed to comply with MEDCOM headquarters'

requests to forward the information required to grant the request of the 20% retention incentive. PFR File, Tab 3 at 16. We have reviewed the record and have found no evidence proving that C.H. contributed to or was the source of WACH's failure to comply with requests from MEDCOM headquarters to forward the required information.[8] Therefore, we agree with the administrative judge's conclusion that the appellant failed to prove that her protected disclosures and protected activity were contributing factors to the decreased retention incentive.

¶40     We now turn to whether the appellant's protected disclosures and protected activity were a contributing factor to the significant change in her duties, responsibilities, and working conditions. Regarding the restriction on the appellant's ability to see pediatric nonsexual abuse patients, the record shows that R.M. became aware of the appellant's protected disclosures in November 2013, HT at 22 (testimony of R.M.), and that he restricted the appellant from seeing those patients between January 2014 and April 2014, W-2 AF, Tab 17 at 17, 20, 22; HT at 48-51, 76 (testimony of R.M). Because R.M. knew of the appellant's disclosures and took the agency action within 2 months of becoming aware of the disclosures, we find that this satisfies the knowledge/timing test. *See Scoggins*, 123 M.S.P.R. 592, ¶ 25 (finding that a personnel action that occurs within 2 years of the appellant's disclosure satisfies the timing component of the knowledge/timing test).

---

[8] The appellant argues that on one of the forms relevant to the retention incentive, C.H. wrote "yes" to the question of whether there were "candidates available in the market who, with minimal training, cost, or disruption of mission, could perform the full range of duties of the position at the level performed by the employee," and that his response would effectively eliminate the appellant's chance to receive a 20% retention incentive. PFR File, Tab 3 at 16-17; W-2 AF, Tab 18 at 18. This argument, however, is unpersuasive because C.H. ultimately recommended a 20% retention incentive. W-2 AF, Tab 18 at 18.

¶41       After R.M.'s departure in April 2014, C.H. became the appellant's supervisor. HT at 115-16 (testimony of C.H.). He testified that he first became aware of the disclosures at the January 2014 meeting. *Id*. at 175-76. He informed the appellant sometime around April or May of 2014 that he would permit her to see pediatric nonsexual abuse patients if she cleared it with him first, HT at 200-01, 488-89 (testimony of C.H. and the appellant), then fully restricted the duty again in August 2014, W-2 AF, Tab 17 at 57. Because C.H. had knowledge of the appellant's disclosures and took his actions within 7 months of becoming aware of the disclosures, we find that this satisfies the knowledge/timing test. *See Scoggins*, 123 M.S.P.R. 592, ¶ 25.

¶42       Regarding removing policy writing from the appellant's duties, the record shows that the WACH Commander directed C.H. to have a particular policy rewritten. W-2 AF, Tab 17 at 30. C.H. indicated in an email to the appellant that the WACH Commander directed him to "hand off the writing of this policy." *Id*. at 32. In June 2014, C.H. delegated the duty to somebody in the Emergency Department. *Id*. Concerning C.H., we have already found that he had knowledge of the appellant's disclosures. *Supra* ¶ 41. Concerning the WACH Commander, the appellant has contended that he had knowledge of her disclosures, IAF, Tab 4 at 5, and the agency has not disputed her contention. Further, the WACH Commander is the agency official who communicated the results of the 15-6 investigation to R.M., who discussed them at the January 2014 meeting. HT at 32 (testimony of R.M.); W-2 AF, Tab 15 at 23-24. Based on the foregoing, we find that the WACH Commander knew of the appellant's disclosures. Because these agency officials took this action within 5 months of learning of the disclosures, we find that the appellant has satisfied the knowledge/timing test on this issue. *See Scoggins*, 123 M.S.P.R. 592, ¶ 25.

¶43       Regarding removing the duty to perform forensic pediatric sexual assault evaluations, the administrative judge considered whether the appellant's disclosures were a contributing factor to this action. ID at 42-43, 47. He found

that the Deputy Commanding General of MEDCOM made the decision to end forensic pediatric sexual assault evaluations in November or December 2014. *Id*.; W-2 AF, Tab 28 at 36. The administrative judge also found that the Deputy Commanding General was aware of the appellant's protected disclosures and protected activity because she was the agency official who ordered WACH to initiate the 15-6 investigation that was prompted by the appellant's protected disclosures and activity. ID at 47; W-2 AF, Tab 43 at 5-8. Thus, the administrative judge found that because she ended the appellant's duty to perform forensic pediatric sexual assault evaluations within 1 year of becoming aware of the appellant's disclosures, the appellant met the knowledge/timing test. ID at 47. The administrative judge also found that the appellant met the knowledge/timing test for C.H.'s declining to seek an exception to ceasing this duty because his inaction occurred within 1 year of becoming aware of the disclosures. *Id*. Neither party disputes these findings on review, and we find no reason to disturb them.

¶44 Regarding removing the appellant's duty to conduct the local training, we find that there is insufficient evidence to determine who made the decision to take this action. The record contains various emails between the appellant and an agency official, wherein both attempted to identify who was responsible for the decision. W-2 AF, Tab 17 at 79-87. The record also includes an email from C.H. to the appellant confirming that all Sexual Assault Medical Forensics Examiners training "courses from this point forward will be central. I received email confirmation today." *Id*. at 73. Nowhere does C.H. reference from whom he received the confirmation, nor has the appellant identified the person responsible for the decision. Because the appellant has not proven who made the decision to remove this duty, she has failed to meet her burden of proof as to this action.

¶45 On the whole, and notwithstanding our finding regarding the local training, we find that the appellant has met her burden of proving that her disclosures and

protected activity were a contributing factor to the significant change in her duties, responsibilities, and working conditions.

<u>The agency failed to prove by clear and convincing evidence that it would have taken the same actions in the absence of the protected disclosures and protected activity.</u>

¶46        Because the appellant established a prima case of whistleblower reprisal, we turn to the question of whether the agency proved by clear and convincing evidence that it would have taken the same actions in the absence of the protected disclosures.  *Lu*, 122 M.S.P.R. 335, ¶ 7.  Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established; it is a higher standard than the "preponderance of the evidence" standard.  *Sutton v. Department of Justice*, 94 M.S.P.R. 4, ¶ 18 (2003), *aff'd*, 97 F. App'x 322 (Fed. Cir. 2004); 5 C.F.R. § 1209.4(e).

¶47        In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of the whistleblowing, the Board will consider all of the relevant factors, including the following (*Carr* factors):  the strength of the agency's evidence in support of its action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.  *Soto v. Department of Veterans Affairs*, 2022 MSPB 6, ¶ 11; *see also Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).  The Board does not view these factors as discrete elements, each of which the agency must prove by clear and convincing evidence, but rather weighs these factors together to determine whether the evidence is clear and convincing as a whole.  *Lu*, 122 M.S.P.R. 335, ¶ 7.  The Board must consider all the evidence, including evidence that detracts from the conclusion

that the agency met its burden. *Soto*, 2022 MSPB 6, ¶ 11; *see also Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012).

> *Restriction on the Appellant from Treating Pediatric Nonsexual Abuse Patients*

¶48 In examining the strength of the evidence in support of the agency's action to restrict the appellant from treating pediatric nonsexual abuse patients, we find the agency's evidence to be weak. At the hearing, R.M. testified that when he limited the appellant from seeing pediatric nonsexual abuse patients, he was following instructions from higher officials as a result of the 15-6 investigation. HT at 30, 80-82 (testimony of R.M.). However, the investigative report simply made recommendations and stated that "[l]eadership needs to clearly define the rules and expectations of all parties when a case occurs." W-2 AF, Tab 43 at 34. It did not require R.M. to remove this duty; he could have formally incorporated the duty, which the appellant was already performing prior to her disclosures, into her position description. Further, the 15-6 investigative report upon which R.M. relied was the direct product of the appellant's protected disclosures and protected activity.

¶49 After R.M.'s departure, C.H. initially permitted the appellant to treat pediatric nonsexual abuse patients only after seeking his approval, but restricted the duty again in August 2014. HT at 200-01, 488-89 (testimony of C.H. and the appellant); W-2 AF, Tab 17 at 57. He emailed the appellant telling her to "hold off" on seeing this classification of patients because, despite being credentialed to see pediatric patients, her position description did not include those duties. W-2 AF, Tab 17 at 57. We find C.H.'s explanation for restricting this duty to be weak. The appellant's job description had not changed in the time period surrounding her disclosures, and the agency does not dispute that the appellant performed these duties prior to making her disclosures. Thus, to rely on the position description as the sole reason to restrict a duty previously permitted prior to the appellant's disclosures is suspect, at best, and does not provide sufficient

support to justify the agency action. Accordingly, we find this factor favors the appellant.

¶50     In examining the existence and strength of the evidence of the agency officials' motive to retaliate, we find the evidence to be strong, particularly regarding R.M. The record is replete with evidence that R.M. was upset with the appellant for making her disclosures outside of her chain of command. Several witnesses testified that during the January 2014 meeting, R.M. expressed his frustration with the appellant for making her disclosures in the manner in which she made them. HT at 26, 126-27, 231, 270-71, 414-15 (testimony of R.M., C.H., S.B., and the appellant). Regarding C.H., at the time the appellant made her disclosures, he was not her supervisor, and the disclosures do not implicate any wrongdoing on his part. However, we have found that those responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, as the criticism reflects on them in their capacities as managers and employees. *Wilson v. Department of Veterans Affairs*, 2022 MSPB 7, ¶ 65; *Smith v. Department of the Army*, 2022 MSPB 4, ¶¶ 28-29. Thus, we find that C.H. may have had a slight motive to retaliate. In any event, because we find the evidence of R.M.'s retaliatory motives to be strong, we find that this factor also favors the appellant.

¶51     Next, we examine any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. The agency has not identified other employees who primarily performed forensic pediatric sexual assault exams, but are credentialed to, and occasionally did, consult with staff on pediatric nonsexual abuse patients. Nonetheless, we find that the relevant inquiry of potential similarly situated employees should be viewed from a different perspective. Because it appears undisputed that the agency took this action as a result of the 15-6 investigation, we look to other employees affected by the report but who did not engage in whistleblowing activity. The agency has failed to identify any of these employees or to

demonstrate that they also experienced a significant change in duties. Because it is the agency's burden of proof, when the agency fails to introduce relevant comparator evidence, the third *Carr* factor is effectively removed from consideration, although it cannot weigh in favor of the agency. *Soto*, 2022 MSPB 6, ¶ 18; *see also Rickel v. Department of the Navy*, 31 F.4th 1358, 1365-66 (Fed. Cir. 2022) ("The lack of evidence on the third *Carr* factor appears neutral[.]") (internal citation omitted). We find that this factor is neutral. *See Siler v. Environmental Protection Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018) (holding that in the absence of relevant comparator evidence, the third *Carr* factor cannot favor the agency).

¶52        Weighing the *Carr* factors against one another and as a whole, we find that the agency has failed to prove by clear and convincing evidence that it would have restricted the appellant's ability to treat pediatric nonsexual abuse patients in the absence of the appellant's protected disclosures and protected activity, particularly because in that absence, the 15-6 investigation would not have occurred.

### Removal of the Appellant's Duty to Write Policy

¶53        In examining the strength of the agency's evidence to reassign the duty of policy writing to another employee, we find the agency's evidence to be weak. C.H. testified that the appellant wrote the original agency policy on handling sexual assaults from a forensic and medical perspective, but the WACH Commander ordered it to be rewritten because it was outdated. HT at 196-97 (testimony of C.H.). The record shows that the WACH Commander asked C.H. to "hand off the writing of this policy." W-2 AF, Tab 17 at 32. C.H. further testified that he had "no idea how it became assigned or why [another] person was chosen," but immediately thereafter testified that the person chosen was the "crossover" between "ambulatory nurse care . . . and the physician side." HT at 197 (testimony of C.H.). He testified that the appellant was not involved in rewriting the policy but was consulted afterward. HT at 198 (testimony of C.H.).

The WACH Commander did not testify, and C.H. offered no explanation for why the appellant, who he admitted was an expert on the subject matter, HT at 123 (testimony of C.H.), was not asked to update the policy that she had previously written and that directly relates to her job duties. That the appellant was later consulted regarding the draft policy helps the agency's case to a degree, HT at 197-98 (testimony of C.H.), but we ultimately conclude that this factor weighs more in the appellant's favor.

¶54     In examining the existence and strength of the evidence of the agency officials' motive to retaliate, we find the evidence to be mixed. We previously found that there was little record evidence that C.H. had a motive to retaliate. However, the appellant has asserted that C.H. told her that the WACH Commander was angry when he learned of the appellant's protected disclosures and protected activity and that he felt "blindsided" when he was called by the Commanding General to explain a situation of which he felt he had no knowledge. IAF, Tab 5 at 22. The agency does not appear to have rebutted this assertion. Notwithstanding the lack of evidence of C.H.'s motive to retaliate, we find that this factor favors the appellant because the WACH Commander was the agency official ultimately responsible for this action, and we find that there is clear evidence that he had a motive to retaliate.

¶55     In examining the third *Carr* factor, we refer to our previous analysis and emphasize that the agency has failed to identify any other employees discussed in the 15-6 investigative report who were not whistleblowers but also suffered a change in job duties as a result of the report. As previously noted, we find this factor is neutral. *See Siler*, 908 F.3d at 1299.

¶56     In weighing the *Carr* factors against one another and as a whole, we find that the agency has failed to prove by clear and convincing evidence that it would have reassigned the appellant's policy-writing duty in the absence of her protected disclosures and protected activity.

*Removal of the Appellant's Duty to Perform Forensic Pediatric Sexual Assault Evaluations*

¶57     Because the administrative judge found that the appellant's protected disclosures were a contributing factor to the agency's decision to remove the appellant's duty to perform forensic pediatric sexual assault evaluations, ID at 47, he also considered whether the agency proved by clear and convincing evidence that it would have taken the same action even in the absence of the appellant's disclosures, ID at 49-51.   After a brief analysis of the *Carr* factors, the administrative judge found that the agency met its burden.   *Id.*   We agree. Regarding the strength of the agency's evidence in support of its action, the record shows that the Deputy Commanding General of MEDCOM issued a memorandum on December 11, 2014, ordering all USA MEDCOM facilities to cease performing these exams, citing a low volume of relevant cases.   W-2 AF, Tab 28 at 36.   The memorandum also indicates that extensions or exceptions to the new policy could be sought.   *Id.*   It appears undisputed that C.H. initially attempted to pursue an exception but was informed that WACH's case numbers were too low to justify an exception.   W-2 AF, Tab 29 at 5-6.   Although, as the administrative judge pointed out, the agency failed to present any statistical or numerical evidence to support its decision regarding the removal of this duty, ID at 49, we find the agency's evidence in support of this action to be reasonably strong.

¶58     In considering the strength of the evidence of the agency officials' motive to retaliate, we reiterate our finding that the evidence of C.H.'s motive to retaliate is weak.   Regarding the Deputy Commanding General of MEDCOM, the administrative judge found that she was "too removed organizationally . . . and physically . . . to be meaningfully embarrassed by the appellant's disclosures." ID at 50.   Yet as noted above, those responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as

the criticism reflects on them in their capacities as managers and employees. *Wilson*, 2022 MSPB 7, ¶ 65; *Smith*, 2022 MSPB 4, ¶¶ 28-29. Because the Deputy Commanding General of MEDCOM can be considered to be responsible for the agency's overall performance, which includes SWS's and CRC's performance, and because she was the agency official who ordered the 15-6 investigation, we find that this factor cuts slightly in favor of the appellant.

¶59 Regarding any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated, the administrative judge appropriately noted that the Deputy Commanding General's policy memorandum applied to all medical treatment facilities in the United States. ID at 50; W-2 AF, Tab 28 at 36. Because the removal of this duty was a part of a broader policy change applicable to all agency employees, we find that this factor favors the agency.

¶60 After our own weighing of the *Carr* factors, we agree with the administrative judge that the agency proved by clear and convincing evidence that it would have removed this duty from the appellant even in the absence of her protected disclosures and protected activity.

¶61 In sum, we find that the agency met its burden with respect to the removal of the appellant's duty to perform forensic pediatric sexual assault evaluations, but failed to meet its burden with respect to the restriction on the appellant's ability to treat pediatric nonsexual abuse patients and the removal of her duty to write policy. Accordingly, we find that the appellant established her claim of retaliation for whistleblowing and that corrective action is warranted.

The administrative judge did not err in finding that the appellant failed to establish that her resignation was involuntary.

¶62 The appellant also alleges that she involuntarily resigned. 0340 IAF, Tab 1 at 7. Generally, the Board lacks authority to review an employee's decision to resign or retire because such actions are presumed to be voluntary. *Vitale v. Department of Veterans Affairs*, 107 M.S.P.R. 501, ¶ 19 (2007). However, if an

agency coerced the employee's decision in a manner that deprived her of freedom of choice, the Board will take jurisdiction over the matter as a constructive removal. *Brown v. U.S. Postal Service*, 115 M.S.P.R. 609, ¶ 9, *aff'd*, 469 F. App'x 852 (Fed. Cir. 2011). The appellant alleges that she involuntarily resigned due to the working conditions created by the personnel actions discussed in her IRA appeals and additional actions unrelated to the IRA appeals. 0340 IAF, Tab 5. In cases such as this, the Board will look to whether the employer engaged in actions that made working conditions so difficult or unpleasant that a reasonable person in that employee's position would have felt compelled to resign. *Vitale*, 107 M.S.P.R. 501, ¶ 20.

¶63   The administrative judge considered this claim and found the appellant failed to prove that the agency took some of the alleged actions and that when she did prove that the agency took some of the actions, she ultimately failed to prove that they created working conditions so difficult or unpleasant that a reasonable person would have felt compelled to resign. ID at 52-63. On review, the appellant seems to allege inconsistencies in C.H.'s hearing testimony concerning the appellant's performance, but she has not offered any specific argument or evidence that demonstrates error in the administrative judge's findings. PFR File, Tab 3 at 31-32; 5 C.F.R. § 1201.115(a)(2). We have reviewed the record, and we have not found any error in the administrative judge's findings.

¶64   Nonetheless, because we have reversed some of the initial decision's findings regarding the reprisal claims, and those claims are partially intertwined with the appellant's involuntary resignation claim, further consideration of the latter claim is appropriate. *See Diefenderfer v. Department of Transportation*, 108 M.S.P.R. 651, ¶¶ 35-37 (2008). Although the appellant has established for the purpose of her whistleblower reprisal appeals that she was subjected to a significant change in duties, responsibilities, and working conditions under section 2302, such a conclusion does not necessarily fulfill the appellant's burden of proving that these conditions were so difficult or unpleasant that she felt

compelled to resign. The appellant still must independently prove these factors, and her reprisal claims may be addressed only insofar as they relate to the question of involuntariness. *Martinez v. Department of the Interior*, <u>88 M.S.P.R. 169</u>, ¶ 13 (2001).

<u>We find that the appellant has failed to show that her working conditions were so difficult or unpleasant that a reasonable person in her position would have felt compelled to resign.</u>

¶65    Although we have found that the appellant suffered a significant change in her duties, responsibilities, and working conditions, the Board has held that the fact that an employee is faced with an inherently unpleasant situation or that her choices are limited to unpleasant alternatives does not make her decision to resign involuntary. *Lawson v. U.S. Postal Service*, <u>68 M.S.P.R. 345</u>, 350 (1995). Here, the appellant already had begun seeking redress on her retaliation claims and could have waited for the outcome of her IRA appeals to determine if resignation was necessary. *See Axsom v. Department of Veterans Affairs*, <u>110 M.S.P.R. 605</u>, ¶ 17 (2009). Instead, the appellant opted to resign prior to adjudicating her retaliation claims. Based on the foregoing, we find that the appellant has failed to prove by preponderant evidence that her resignation was involuntary.

<u>The administrative judge did not err in reopening the record to accept supplemental closing arguments but not additional evidence after he requested that the agency submit an unredacted copy of the 15-6 investigative report.</u>

¶66    After the hearing, the administrative judge ordered the agency to submit an unredacted copy of the 15-6 investigative report. W-2 AF, Tab 39. The agency submitted it, W-2 AF, Tabs 43-44, and the appellant filed a motion to reopen the record for the limited purpose of supplementing her closing argument, W-2 AF, Tab 45. The administrative judge reopened the record for the limited purpose requested by the appellant, W-2 AF, Tab 46, and both parties submitted supplemental closing arguments, W-2 AF, Tabs 47-48. On review, the appellant argues that she should have been permitted to take additional testimony, rather than simply submitting a supplemental closing argument. PFR File, Tab 3 at 4-5.

The appellant's argument is unpersuasive. The administrative judge reopened the record for the purpose requested by the appellant herself; if she wished to request leave to take additional testimony, she could have done so at the time. Additionally, the appellant was afforded two opportunities to address the substance of the unredacted report: first, in her motion to reopen the record and, second, in her supplemental closing argument. W-2 AF, Tabs 45, 47. Accordingly, we find no error in the administrative judge's conduct.[9] *See* 5 C.F.R. § 1201.41(b).

In light of the appellant's voluntary resignation, the Board is limited in the relief that can be provided relating to the personnel actions at issue.

¶67 As set forth above, we find that corrective action is warranted. However, due to the appellant's voluntary resignation, we find that the Board is limited in the relief that can be provided relating to any personnel action at issue in the IRA appeals. The appellant may, nonetheless, be entitled to consequential and/or compensatory damages.

### NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set forth at title 5 of the United States Code (5 U.S.C.), sections 7701(g), 1221(g), or 1214(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees and costs WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion for attorney fees and costs with the office that issued the initial decision on your appeal.

---

[9] We have reviewed the relevant legislation enacted during the pendency of this appeal and have concluded that it does not affect the outcome of the appeal.

## NOTICE TO THE APPELLANT REGARDING
## YOUR RIGHT TO REQUEST CONSEQUENTIAL AND/OR
## COMPENSATORY DAMAGES

You may be entitled to be paid by the agency for your consequential damages, including medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages. To be paid, you must meet the requirements set out at 5 U.S.C. §§ 1214(g) or 1221(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202 and 1201.204.

In addition, the Whistleblower Protection Enhancement Act of 2012 authorized the award of compensatory damages including interest, reasonable expert witness fees, and costs, 5 U.S.C. § 1214(g)(2), which you may be entitled to receive.

If you believe you are entitled to these damages, you must file a motion for consequential damages and/or compensatory damages WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion with the office that issued the initial decision on your appeal.

## NOTICE TO THE PARTIES

A copy of the decision will be referred to the Special Counsel "to investigate and take appropriate action under [5 U.S.C.] section 1215," based on the determination that "there is reason to believe that a current employee may have committed a prohibited personnel practice" under 5 U.S.C. § 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D). 5 U.S.C. § 1221(f)(3). Please note that while any Special Counsel investigation related to this decision is pending, "no disciplinary action shall be taken against any employee for any alleged prohibited activity under investigation or for any related activity without the approval of the Special Counsel." 5 U.S.C. § 1214(f).

## NOTICE OF APPEAL RIGHTS[10]

The initial decision, as supplemented by this Final Order, constitutes the Board's final decision in this matter. 5 C.F.R. § 1201.113. You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

---

[10] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of

discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or

other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[11] The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at

---

[11] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD: /s/ for
_____
Jennifer Everling
Acting Clerk of the Board
Washington, D.C.